STURDY CONCRETE CORP., Appellant, v NAB CONSTRUCTION CORP., Respondent.

Second Department, December 26, 1978

APPEARANCES OF COUNSEL

*Goetz & Fitzpatrick, P. C. (William B. Flynn* and *Peter Goetz* of counsel), for appellant.

*Norman Roth* for respondent.

**OPINION OF THE COURT**

*Per Curiam.*

In an action by a subcontractor to recover (1) the balance due on the subcontract and (2) the value of extra work allegedly performed, in which the general contractor counterclaimed to recover the value of work it was allegedly required to perform due to the subcontractor's unsatisfactory performance, plaintiff appeals from portions of a judgment of the Supreme Court, Queens County, entered March 1, 1977, which, after a nonjury trial, awarded it the sum of only $900 on the complaint and dismissed the remainder thereof, and awarded defendant the sum of $120,889.74, together with interest, costs and disbursements, on the counterclaim.

The judgment should be modified by (1) deleting therefrom (a) the decretal paragraph directing defendant to reduce the money it has retained under the provisions of article XIII of the subcontract to 5% and to pay the balance of said retainage to plaintiff, and (b) the decretal paragraph awarding defendant judgment on the counterclaim and (2) dismissing so much of the counterclaim as seeks to recover for work which defendant alleges, upon information and belief, that it will be required to perform. As so modified, the judgment should be affirmed insofar as appealed from, and the action remitted to Trial Term for a new trial.

Defendant NAB Construction Corp. (NAB) was awarded a contract by the Port Authority of New York and New Jersey (Port Authority) for the reconstruction of roof structures on North River Piers 88, 90 and 92 on Manhattan's West Side. On September 7, 1972 NAB entered into a subcontract with plaintiff Sturdy Concrete Corp. (Sturdy), by which the latter was to perform certain construction work on the project

having mostly to do with the pouring of concrete. The subcontract price was $655,000.

According to Sturdy, it commenced work in December, 1972 and had substantially completed its work on or about February 1, 1974. Sturdy further alleged that, as of that date, the sum of $77,909.20 was still owing on the subcontract price.

Sturdy subsequently brought this action to recover the balance due on the subcontract, as well as the sum of $305,974.70, representing the fair and reasonable value of work, labor, services and materials alleged to have been performed or provided as extras.

Sturdy's bill of particulars separated its claim for extras into seven categories, as follows:

(1) $4,547.13 for extra work in connection with certain concrete footings;

(2) $12,442.63 for extra work on Pier 88, ordered by the Port Authority;

(3) $11,659.37 for extra work on Pier 90, also ordered by the Port Authority;

(4) $11,867.25 for various extra work authorized in writing by NAB (this item was settled during the trial);

(5) $23,833.14 for various extra work not authorized in writing by NAB;

(6) $5,032.98 for the patching of "birdbaths" in pre-existing concrete decks; and

(7) $236,591.20 for extra concrete alleged to have been required because of unanticipated deflection of the metal deck structure upon which Sturdy poured new roof slabs.

NAB interposed a general denial and raised the following affirmative defenses pertinent to this appeal:

(1) the claims set forth as items two and three in Sturdy's bill of particulars were premature, because the value of the extra work had not been determined by the Port Authority engineer, as required by the subcontract;

(2) the claim set forth as item five was not authorized in writing by NAB, as required by the subcontract; and

(3) the claim for final payment on the subcontract was premature, because NAB had not received final payment from the Port Authority, a condition precedent to Sturdy's payment.

In addition, NAB counterclaimed for the sum of $125,000,

alleged to be its damages suffered by reason of deficiencies in Sturdy's performance of subcontract work.

The counterclaim is analytically separable into three components:

(1) $26,947.32 for subcontract work which NAB allegedly performed itself, and for which it backcharged Sturdy;

(2) $43,000 for subcontract work which NAB alleged it would be required to perform but which it had not performed as of the time the action was commenced; and

(3) $64,931.88 for subcontract work allegedly performed by Brisk Waterproofing Co., another subcontractor on the project, on Sturdy's behalf, which sum was allegedly paid to Brisk by NAB, and which sum was backcharged to Sturdy.

After a lengthy trial, the court dismissed the complaint in its entirety, with the exception of $900 of item five, for which sum judgment for Sturdy was entered. The court awarded NAB the sum of $120,889.74 on its counterclaim. This sum represented the full amount of the claim for work done by Brisk, $64,931.88, plus 80% of the claim for the work performed or to be performed by NAB. The court excluded from this latter item 15% representing overhead and 5% representing profit. Sturdy has appealed.

Of the six items of Sturdy's claim for extras upon which Trial Term ruled, only the dismissal of item one is not cited by Sturdy as erroneous. As to the five remaining items, we affirm Trial Term's disposition, although we differ in some particulars with its reasoning. We deal with those items seriatim.

As to items two and three, it is not disputed that the extra work claimed was authorized by the Port Authority. The question posed as to these items is whether Sturdy is entitled to immediate payment, or whether such payment must await a determination by the Port Authority's engineer as to the value of the work performed. We agree with Trial Term that these claims are premature, but we reach this result upon a different interpretation of the relevant provisions of the general contract and the subcontract.

The specific subcontract provision pertaining to payment for extra work is a typewritten addendum to article II: "All extra work will be done as agreed by the parties concerned and paid for on an agreed lump sum basis and/or time and material plus over head. This work is to be done with normal standards

used in the building industry. Payments on extra work will be done on a monthly requisition as work progresses and they will be paid in full without retainage."

Paragraph 17 of the general contract sets forth the manner in which contract disputes were to be resolved: "to resolve all disputes and to prevent litigation the parties to this Contract authorize the Engineer acting personally, to decide all questions of any nature whatsoever arising out of, under, or in connection with, or in any way related to or on account of, this Contract * * * and his decision shall be conclusive, final and binding on the parties."

Certain provisions of the general contract are incorporated into the subcontract by article I of the subcontract: "[T]he Sub-Contractor agrees with the Contractor to be bound to the latter by the terms of the Contract and the General Conditions and by the plans, drawings, details, specifications, amendments and addenda thereto, all of which are made a part hereof, insofar as they are or can be applicable to this sub-contract and to the Sub-Contractor's trade and work thereunder. The Sub-Contractor assumes toward the Contractor any and all obligations, duties, risks and responsibilities * * * which by the foregoing documents the Contractor assumes toward the Owner and the Sub-Contractor agrees that its rights shall be subject to all of the limitations which by the Construction Contract are imposed on the Contractor".

As Sturdy interprets these provisions, article II of the subcontract contains a specific typed provision providing for the payment for extra work without the approval of the Port Authority engineer. This provision, in Sturdy's view, expressly negates the form provision of the general contract calling for resolution of disputes by the engineer and, thus, to the extent that disputes between the general contractor and the subcontractor pertain to the payment of claims for extra work, paragraph 17 of the general contract is not incorporated into the subcontract.

It is apparent that upon this interpretation, NAB would be placed in a difficult position should the Port Authority dispute Sturdy's charges for extra work. NAB would be forced to pay Sturdy the full amount of the claim and look to the Port Authority for reimbursement. To the extent that the Port Authority refused to pay the entire amount, NAB would suffer the loss. Absent some express indication that NAB intended to

assume this risk we would not interpret article II to require such a result.

It is our view that the typewritten addition to article II is a timing provision only, and that it is not meant to place upon NAB the ultimate legal responsibility to pay the full amount of Sturdy's claim for extras, without regard to the position of the Port Authority.

We construe the interplay between these various contract provisions as follows: In the absence of any dispute between Sturdy and the Port Authority over the value of extra work performed, payment by NAB to Sturdy should be made in accordance with article II, that is, on a monthly basis. However, where such a dispute exists, paragraph 17 applies and the matter must be resolved by the engineer.

Turning to the facts of this case, it is clear that the Port Authority has disputed Sturdy's charges for this extra work. There was testimony that the Port Authority had offered Sturdy only $10,000 on these claims totaling approximately $23,000 and that the matter had not been resolved. Under these circumstances, the dispute was properly referred to the Port Authority engineer and the claims were properly dismissed as premature.

As to item five of Sturdy's claim for extras, there is no dispute that under the subcontract, extra work was required to be the subject of a separate written agreement. Trial Term dismissed this item, with the exception of $900, finding that the work was not ordered in writing and that there were no facts from which it could be concluded that NAB had waived compliance with that requirement.

A review of the evidence shows without question that with the exception of some 52½ hours of labor at the fair and reasonable value of $900, for which time and material verification sheets were signed by NAB's agent, none of the work upon which this claim is based was authorized or evidenced in writing.

Nor are there such facts as would sustain a finding of waiver. The cases relied upon by Sturdy for this proposition are inapposite because in those cases it was found that the work performed had been orally directed (see e.g., *Davis Accoustical Corp. v National Sur. Corp.,* 27 AD2d 624). Here, Sturdy's project manager testified that NAB had authorized the work orally. This contention was disputed by defendant's witnesses. Thus, the value to be assigned to the testimony of

Sturdy's project manager was clearly a question of credibility to be determined by Trial Term, in its discretion. The fact that the testimony was given little or no credit is no basis for reversal.

■ We see no other facts indicative of a waiver and, accordingly, we conclude that the dismissal of this item was proper.

■ Item six of Sturdy's claim for extras pertains to Sturdy's attempt to patch "birdbaths" or depressions in pre-existing concrete (i.e., concrete which was not poured by Sturdy pursuant to the subcontract). There is no dispute that the patches made by Sturdy failed and that NAB subsequently turned to Brisk to correct this problem. Sturdy's efforts were thus of no value to NAB. Under these circumstances, for Sturdy to recover the value of this work it had to show that its failure in this regard either was not its fault, or was NAB's fault. No such showing was made. Accordingly, this item was also properly dismissed.

Under item seven, Sturdy seeks the fair and reasonable value of some 1,230 cubic yards of concrete which it alleges it was required to pour in excess of its original project estimates, due to the unanticipated deflection of the metal decks supporting the roof slabs which it poured. A review of the trial testimony reveals that Sturdy failed to sustain its burden of proof as to this item.

■ First, Sturdy could present no satisfactory evidence showing the amount of concrete it had estimated it would use prior to the time the job was bid. Sturdy's project manager could testify only as to an estimate he had made long after litigation had commenced. Sturdy's president could only approximate an estimate he claims was made prior to the commencement of the work. He admitted that he had not made the calculation and that no documentary evidence of the calculation was available.

Second, even if Sturdy had satisfactorily proved the existence of a prebid estimate, it failed to prove that the extra concrete allegedly used was required by the deflection of the metal decking. Sturdy's expert testified to an estimated deck deflection of one and one-sixteenth inches. However, this estimate was apparently based on visual observations only. No instrument measurements were made by him. Further, the expert did not give an opinion as to how much extra concrete a deck deflection of one and one-sixteenth inches would require.

Conversely, NAB's expert made numerous measurements of the deck structure using surveyor's instruments. He found the deck deflection to be only one quarter of an inch at its maximum point and only one sixteenth of an inch on the average. He estimated the extra concrete required by such deflection to be only six cubic yards. Clearly, under these circumstances, the preponderance of the evidence supported NAB and this item was properly dismissed.

We turn now to the question of whether Sturdy is presently entitled to payment of the entire subcontract balance. Article XIII of the subcontract provides, in part: "Final payment, including retained percentage, shall be paid within ten (10) days after final payment is received by the Contractor from the Owner * * * Retainage to be reduced to 5% within 30 days after Subcontractors work is substantially completed."

Inasmuch as there was no dispute that NAB had not received final payment from the Port Authority, Trial Term considered Sturdy's claim for payment to be premature. However, the court did direct NAB to reduce the money it had retained to 5% and to pay the remainder to Sturdy.

Sturdy argues that Trial Term was incorrect in concluding that its claim for payment was premature. We agree that the claim is not premature but, on this record, we cannot say that Sturdy is presently entitled to the entire subcontract balance.

■ It is now settled in this State that subcontract provisions such as article XIII do not serve to shift to the subcontractor the risk of delay in payment by the owner to the general contractor.

In *Schuler-Haas Elec. Co. v Aetna Cas. & Sur. Co.* (49 AD2d 60, affd 40 NY2d 883), defendant Aetna had issued a payment bond on behalf of the general contractor for the benefit of the subcontractors. One of the subcontractors brought suit on the bond. Aetna defended on the basis of a subcontract provision similar to article XIII herein. Aetna argued that since the owner had not paid the general contractor, the latter was not yet liable to the subcontractor and, therefore, Aetna could not be liable on the payment bond. The Appellate Division, Fourth Judicial Department, held for the subcontractor (49 AD2d, at pp 64-65):

"In the absence of a clear expression in the contract papers that the credit risk of the general contractor and the delay in payment frequently attending on construction projects are

meant to be shifted to such suppliers and subcontractors, the contract instruments should not be construed as intending such assumption *(Dyer Co. v Bishop Int. Eng. Co.,* 303 F2d 655 [6th Cir, 1962]). Indeed, it is presumed that the parties did not intend that payment of the small subcontractors should await the determination of an extended legal dispute between the owner and the general contractor over an issue not concerning him or his work *(Eastern Heavy Constructors v Fox,* 231 Md 15, 19-20 [1963]). * * *

"Courts in other jurisdictions which have construed similar provisions in payment bonds have held that the clauses in the several contracts for the project which provide that the contractor shall pay his subcontractors within a stated number of days after the contractor has received payment from the owner, merely *fix the time* when payment is due and do not establish a condition precedent to payment *(Howard-Green Elec. Co. v Chaney & James Constr. Co.,* 12 NC App 63 [1971]; *Wolfe Co. v Baltimore Contrs.,* 355 Mass 361 [1969]; *Fishman Constr. Co. v Hansen,* 238 Md 418 [1965]; *Dyer Co. v Bishop Int. Eng. Co.,* 303 F2d 655, *supra; Moore v Continental Cas. Co.,* 366 F Supp 954 [WD Okla, 1973])."

In affirming, the Court of Appeals stated (40 NY2d, at p 885): "If as here there is no express language to the contrary in the written document (and no extrinsic evidence), the standard would seem to be that where payment is stipulated to occur on an event, the occurrence of the event fixes only the time for payment; it is not to be imported as a substantive condition of the legal responsibility to pay."

Thus, NAB cannot rely upon the provisions of article XIII of the subcontract to resist payment of the subcontract balance more than four years after Sturdy left the job site. However, this is not to say that Sturdy is entitled to payment of the entire subcontract balance.

In *Schuler-Haas,* the parties had stipulated that the subcontractor had performed its work satisfactorily. There has been no such agreement here. Rather, NAB has suggested that the Port Authority may make further adjustments in the final payment to NAB because of deficiencies in Sturdy's performance. We agree that to the extent final payment to NAB is being withheld because of Sturdy's unsatisfactory performance, NAB should not be required to make final payment to Sturdy. Such a requirement would unjustly place NAB in the position of having to look to Sturdy for restitution should the

Port Authority make further deductions in its final payment because of Sturdy's deficient performance. However, mere speculation that delay in final payment to NAB is due to Sturdy's omissions is not sufficient to deny Sturdy final payment. Rather, NAB must bear the affirmative burden of showing that the delay is so caused.

Accordingly, at the new trial, Trial Term should determine how much, if any, money is being withheld by the Port Authority because of dissatisfaction with Sturdy's performance. To that extent NAB may withhold final payment from Sturdy. In no event, however, should the amount withheld exceed 5% of the subcontract price, inasmuch as NAB has not appealed from that reduction in its retainage.

We turn finally to the issues presented on the award to NAB on its counterclaim.

Of the $69,947.32 NAB sought to recover for its own work, $43,000 was for work which NAB had not performed as of the date of its bill of particulars, November 25, 1974, but which it alleged, on information and belief, it would be required to perform. This component of the award was improper.

A search of the record reveals a complete failure of proof as to this element of the counterclaim. There was no evidence that NAB would actually be required to perform the work as alleged, much less that such work was required by omissions in Sturdy's performance of the subcontract. Further, there was no indication that the amount sought by NAB was the fair and reasonable value of the work to be performed. Under these circumstances, we see no reason to extend to NAB a second opportunity to prove these damages. Accordingly, that portion of the counterclaim should be dismissed.

The remaining $26,947.32 of NAB's counterclaim for its own work was backcharged to Sturdy on the basis of 161 time and material verification sheets. As to these charges, different problems are presented.

Article VIII of the subcontract provided that if the subcontractor failed to finish its work in a substantial and workmanlike manner, the contractor could upon three working days' notice to the subcontractor, complete the work itself, at the subcontractor's expense. This provision obviously served a dual purpose: to permit the general contractor to finish unperformed subcontract work and, more importantly in this case, to give the subcontractor the opportunity to cure its unsatis-

factory performance before being charged with the cost of completion.

■ In our view, article VIII prevents recovery by NAB for subcontract work where Sturdy had neither knowledge nor notice that it had omitted to perform such work.

One common method of notifying a subcontractor of omissions in its performance is by a punchlist, a list of items required by the subcontract which have not, as of the date of the punchlist, been performed by the subcontractor.

Two punchlists were introduced into evidence here. Of the 161 backcharged time and material verification sheets, 94 were set forth in their entirety in either or both of the punchlists. Sixty-two of the sheets were not set forth in either of the punchlists. Of the work set forth on the remaining five sheets, one half appeared on punchlists and the other half not. In our view, NAB is not entitled to recover for those items of work not included on the punchlist, unless it can show that Sturdy had actual knowledge of such omissions, or that it was otherwise notified thereof.

Inasmuch as the proof of knowledge or notice is otherwise ambiguous at best, Trial Term should hear further evidence on this question of notice.

One final issue remains as to NAB's work on behalf of Sturdy. The record indicates that $4,737.68 was backcharged to Sturdy for removal of debris from the job site. NAB's own witness, among others, testified that some of this debris had been stockpiled. Sturdy properly points out that article I of the subcontract provides that: "The scope of work shall include * * * stockpiling of rubbish in locations as directed by our superintendent".

■ Thus, to the extent that Sturdy was backcharged for the removal of stockpiled rubbish, NAB was not entitled to recover. Accordingly, Trial Term should hear evidence on the question of the fair and reasonable value of NAB's work in stockpiling Sturdy's debris. Such sum shall be recoverable by NAB, but only to the extent that Sturdy had knowledge or notice that it had failed to comply with the subcontract in this regard.

The remaining portion of NAB's counterclaim is composed of work done by Brisk Waterproofing Co., the waterproofing subcontractor on the project.

Brisk was called in by NAB to correct birdbaths in concrete

poured by Sturdy, which condition Sturdy itself had been unable to correct. Sturdy was backcharged for this work in the amount of $64,931.88, which NAB alleged was the sum charged by Brisk. Two distinct problems are presented by the award of this amount. The first of these relates to NAB's calculation of the backcharge. The testimony of NAB's witness was that Brisk's work, which was not restricted to the patching of birdbaths on concrete poured by Sturdy, was set forth in "very descriptive" daily time sheets. When NAB received Brisk's monthly invoices, it was allegedly a simple matter to determine which part of the invoice applied to work chargeable to Sturdy, and which did not.

The key distinction for purposes of this case is between "new" concrete, concrete poured by Sturdy pursuant to the subcontract, and "old" concrete, concrete for which Sturdy had no responsibility. Brisk's work on new concrete was properly chargeable to Sturdy. Its work on old concrete was chargeable to the Port Authority.

A review of Brisk's daily time sheets shows that while some do distinguish between new concrete and old concrete, others refer only to "patching birdbath areas". It is not clear how NAB knew whether such work was chargeable to Sturdy.

■ Furthermore, the invoices from which NAB allegedly apportioned Brisk's charges between Sturdy and the Port Authority were not before Trial Term. The only invoice introduced into evidence set forth all of Brisk's extra work charges. Brisk's own president testified that he could not distinguish which of the charges on this invoice were for work performed on behalf of Sturdy and which of the charges were for other work. Under these circumstances, we find NAB's proof unsatisfactory.

We are inclined to the view that the proof of NAB's payments to Brisk is insufficient. It is evident that NAB may recover from Sturdy only such sums as NAB in fact paid to Brisk. NAB's witness testified that three checks were sent to Brisk and that one, in the approximate amount of $60,000, was payment for work chargeable to Sturdy. However, these checks were not introduced into evidence and there was no testimony whatever as to the remaining $4,931.88 backcharged to Sturdy for Brisk's work. Before NAB may recover for corrective work performed by Brisk, adequate proof should be presented both as to how NAB calculated the amount

backcharged to Sturdy and as to how much it actually paid to Brisk.

We note in conclusion that, upon the new trial, any sums found properly recoverable by NAB on its counterclaim should exclude the elements of overhead and profit.

HOPKINS, J. P., DAMIANI, RABIN and MARGETT, JJ., concur.

Judgment of the Supreme Court, Queens County, entered March 1, 1977, modified, on the law and the facts, by deleting the sixth and seventh decretal paragraphs thereof. As so modified, judgment affirmed insofar as appealed from, without costs or disbursements, so much of the counterclaim as seeks to recover for work which defendant alleges, upon information and belief, it will be required to perform, is dismissed, and the action is remitted to the Trial Term for a new trial in accordance with the opinion herein.