**Harrison McCLAIN, Plaintiff/Appellee,**

v.

**KIMBROUGH CONSTRUCTION COMPANY, INC., Defendant/Appellant.**

Court of Appeals of Tennessee,
Middle Section at Nashville.

Dec. 19, 1990.

Application for Permission to Appeal
Denied by Supreme Court
March 11, 1991.

Steven A. Riley, Margaret C. Berry, Bass, Berry & Sims, Nashville, for defendant-appellant.

James D. Kay, Jr., Donald Capparella, Manier, Herod, Hollabaugh & Smith, Nashville, for plaintiff-appellee.

## OPINION

KOCH, Judge.

This appeal involves a dispute between a general contractor and a brick mason concerning work on a condominium project in Nashville. After the general contractor unilaterally terminated the subcontract be-fore the work was complete, the brick mason filed an action in the Chancery Court for Davidson County to recover its lost profits. The contractor counterclaimed for the cost to correct portions of the brick mason's work and for overpayments. The trial court awarded the brick mason $6,798 and dismissed the contractor's counterclaim. The contractor has appealed. While we concur with the trial court's finding that the subcontractor was damaged by the general contractor's unilateral termination of the contract, we do not concur with the manner in which the trial court calculated the damages. Accordingly, we vacate the damage award and remand the case for further proceedings.

### I.

The Kimbrough Construction Company ("Kimbrough") was the general contractor on a condominium project in Nashville called the Woodlawn Court Condominiums. On November 6, 1987, it entered into a subcontract with Harrison McClain Masonry Company ("McClain") to do the brick work for the project. McClain agreed "to complete the work in a timely fashion and in a good and workmanlike manner," and in return, Kimbrough agreed to pay McClain $25,450.[1]

McClain began work in mid-November, 1987. Its employees laid over 20,000 bricks during the ensuing three weeks but were forced to stop work because Kimbrough had not completed the grading around the buildings. Mr. McClain and Kimbrough's project superintendent discussed the situation on December 3, 1987 and agreed that McClain's crew could begin work on another job and that Kimbrough would call them back when the brick work could be completed.

Several problems concerning the brick work arose while McClain's crew was on the job. Kimbrough's superintendent was dissatisfied with the color of the brick.[2]

---

1. The parties estimated that 78,000 bricks would be required to complete the job. The amount of the contract was based on McClain charging $275 per 1,000 bricks laid and $1,000 for each "four brick chimney chase."

2. The brick was an owner-supplied item; therefore, McClain was not responsible for the color of the brick. That matter was between Kimbrough and the brick supplier.

He also questioned several other portions of McClain's work, particularly a chimney chase, a "soldier course" on the top of a wall,[3] and some brick work around a garage door. While Mr. McClain agreed to replace the brick in these areas, he did not follow the superintendent's instructions to do the remedial work so that the bricks could be reused. The superintendent and Mr. McClain's brother also became involved in a heated argument concerning the chimney chase.

Kimbrough's superintendent never called McClain's crew back. Instead, he decided that McClain's work had been unacceptable and that he would retain another brick mason to complete the job. Without notice to Mr. McClain, the superintendent entered into a contract with another brick mason to complete the job and to repair or replace portions of McClain's work.[4]

Mr. McClain did not discover that Kimbrough had retained another brick mason until early February, 1988 when he observed other bricklayers working on the project. Three months later, he filed a breach of contract action against Kimbrough seeking lost profits and the retainage on the work his crew had performed. Kimbrough counterclaimed for the expenses it incurred in replacing portions of McClain's work and for overpayments.

The trial court concluded that Kimbrough breached its contract with McClain by interfering with McClain's work and by failing to give McClain an opportunity to correct its defective work or to complete the job before hiring another brick mason. The trial court also found that Kimbrough's unilateral action prevented it from recovering the additional expenses it incurred in completing the job and correcting the defective work.

3. A "soldier course" is a row of bricks laid vertically rather than horizontally.

4. The unit prices in Kimbrough's contract with the second brick mason were less than those in the contract with McClain. Kimbrough also agreed to pay the second brick mason $4,020 to correct the portions of McClain's work that Kimbrough thought were defective.

## II.

The parties' agreement was embodied in a one-page document prepared by Kimbrough. The "subcontract agreement" identified the contracting parties, described the scope of the work, and set forth the amount of the contract and the terms of payment. It also contained the usual provisions regarding written change orders and retainage.

The subcontract did not, however, contain many of the provisions normally found in construction contracts. It did not, for example, contain a "flow down" clause tying the subcontractor's performance to the contractor to the contractor's obligations to the owner. In addition, it lacked a construction schedule, an inspection and acceptance process, and a dispute resolution procedure.

Of primary importance to this case, the subcontract did not contain a "take over" clause permitting Kimbrough to terminate the subcontract and to take over the work. Typically, a "take over" clause permits a contractor to assume control of and to carry out a defaulting subcontractor's work after giving the subcontractor reasonable notice and an opportunity to correct its defective performance.[5] In the absence of a "take over" clause, Kimbrough must find some other support for its claimed right to terminate the subcontract before its completion without first giving McClain notice and an opportunity to cure. Kimbrough has pointed to no other support, and, under the facts of this case, we can find none.

A contracting party may terminate the contract when the other party (1) is wholly unable to complete the contract, *City of Bristol v. Bostwick*, 146 Tenn. 205, 211, 240 S.W. 774, 776 (1922); (2) manifests an intent to abandon the contract, *Brady v.*

5. Examples of typical "take over" clauses can be found in Articles 3.4.1 and 7.2.1 of the "Standard Form of Agreement Between Contractor and Subcontractor," AIA Document A401 (1987 ed.).

*Oliver*, 125 Tenn. 595, 614, 147 S.W. 1135, 1139 (1911); (3) manifests an intent to no longer be bound by the contract, *Church of Christ Home for Aged, Inc. v. Nashville Trust Co.*, 184 Tenn. 629, 642, 202 S.W.2d 178, 183 (1947); or (4) commits fraud on the party seeking to terminate the contract. *W.F. Holt Co. v. A & E Elec. Co.*, 665 S.W.2d 722, 730 (Tenn.Ct.App.1983).

The record contains no proof that McClain committed fraud or that he was unable to complete or intended to abandon the contract. On the contrary, McClain stopped work because Kimbrough could not provide a site suitable for finishing the job. McClain left the job with Kimbrough's assent in order to avoid idling its crew and was prepared to return as soon as Kimbrough gave notice that the conditions at the job site would permit him to complete the work.

### III.

■ Contracting parties should endeavor to define their respective rights and obligations precisely. *See V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd.*, 595 S.W.2d 474, 482 (Tenn.1980); *Forrest, Inc. v. Guaranty Mortgage Co.*, 534 S.W.2d 853, 857 (Tenn.Ct.App.1975). As a practical matter, however, contracting parties are not always precise and frequently leave material provisions out of their contracts. In these situations, the courts impose obligations on contracting parties that are reasonably necessary for the orderly performance of the contract.

For example, we have required contracting parties to deal with each other fairly and in good faith, even though these duties were not explicitly embodied in their contract. *Williams v. Maremount Corp.*, 776 S.W.2d 78, 81 (Tenn.Ct.App.1988); *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn.Ct.App.1987); *Covington v. Robinson*, 723 S.W.2d 643, 645 (Tenn.Ct.App. 1986). We have also held the extent of contractual obligations should be tempered by a "reasonableness" standard. *Moore v. Moore*, 603 S.W.2d 736, 739 (Tenn.Ct.App. 1980).

In the construction context, we have imposed upon contractors the obligation to give their subcontractors a reasonable opportunity to perform. *Foster & Creighton Co. v. Wilson Contracting Co.*, 579 S.W.2d 422, 425–26 (Tenn.Ct.App.1978). Other courts have also recognized that contractors have an implied obligation to provide their subcontractors with suitable working conditions. *See* 1 S. Stein, *Construction Law* ¶ 5.02[3][e] (1990).

■ Despite the importance of notice, contracting parties frequently fail to include express notice provisions in their agreements. *See* 6 S. Williston, *A Treatise on the Law of Contracts* § 887B (3d ed. 1962). Notice ought to be given when information material to the performance of a contract is within the peculiar knowledge of only one of the contracting parties. In the absence of an express notice provision, the courts will frequently imply an obligation to give notice as a matter of common equity and fairness. 3A A. Corbin, *Corbin on Contracts* § 725 (1964).

Requiring notice is a sound rule designed to allow the defaulting party to repair the defective work, to reduce the damages, to avoid additional defective performance, and to promote the informal settlement of disputes. *Pollard v. Saxe & Yolkes Dev. Co.*, 12 Cal.3d 374, 525 P.2d 88, 92, 115 Cal. Rptr. 648, 652 (1974); *Sturdy Concrete Corp. v. Nab Constr. Corp.*, 65 A.D.2d 262, 411 N.Y.S.2d 637, 644 (1978). Thus, even when the parties have not included a "take over" clause in their contract, courts have imposed upon contractors the duty to give subcontractors notice and an opportunity to cure before terminating the contract for faulty performance. *United States ex rel. Cortolano & Barone, Inc. v. Morano Constr. Corp.*, 724 F.Supp. 88, 98 (S.D.N.Y. 1989); *see also Cyclo Floor Machine Corp. v. National Housewares, Inc.*, 296 F.Supp. 665, 682 (D.Utah 1968) (imposing a notice requirement in a nonconstruction context).

■ Under the facts of this case, we find that Kimbrough had a duty to give McClain notice and a reasonable opportunity to correct its defective work before terminating the contract. Kimbrough's failure to give

McClain notice constitutes a material breach unless Kimbrough was excused from performing its obligations under the subcontract.

■ Only McClain's uncured material failure to perform its own contractual obligations would have excused Kimbrough from performing its remaining obligations. *See* Restatement (Second) of Contracts § 237 (1979).[6] The circumstances significant in determining whether a party's failure to perform is material include:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (1979).

Applying the Restatement's standards to this case, we find that the deficiencies in McClain's performance were not material and, therefore, that Kimbrough was not entitled to terminate the contract in the manner it did. McClain acted in good faith throughout its dealings with Kimbrough. If there were defects in McClain's work, they could have been corrected. In fact, McClain had already corrected several portions of its work when Kimbrough expressed dissatisfaction with them. There is no indication that McClain would not have agreed to correct any other portions of its work had it been asked to do so.

Accordingly, we find that the subcontract obligated both parties to deal with each other fairly and in good faith and to give each other notice before they unilaterally terminated the contract. Kimbrough did not give notice and had no basis for failing to do so. Therefore, Kimbrough breached the contract when it hired another brick mason to replace McClain without giving McClain notice and a reasonable opportunity to perform in the manner required by the contract.

## IV.

■ Kimbrough also asserts that McClain is not entitled to damages, even if Kimbrough breached the contract, because McClain breached the contract first. The facts do not support Kimbrough's claim.

■ A party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract. *John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.*, 715 S.W.2d 41, 47 (Tenn. 1986); *Cummins v. McCoy*, 22 Tenn.App. 681, 691, 125 S.W.2d 509, 515 (1938). Thus, in cases where both parties have not fully performed, it is necessary for the courts to determine which party is chargeable with the first uncured material breach. *See* Restatement (Second) of Contracts § 237 comment b (1979).

Kimbrough did not provide McClain's crew a suitable place to work or a reasonable opportunity to perform, and it did not give McClain notice before unilaterally terminating the subcontract and hiring another brick mason to finish the job. These breaches preceded McClain's failure to complete the work in a workmanlike manner and were of sufficient magnitude to justify McClain's failure to continue and complete its performance of the contract. Thus, McClain's failure to fully perform its contractual obligations should not prevent it from seeking damages from Kimbrough.

---

**6.** With one exception not applicable in this case, "it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." Restatement (Second) of Contracts § 237 (1979).

## V.

The remaining issues involve the amount of damages the trial court awarded to McClain. Kimbrough challenges the damage award, asserting that McClain failed to prove its damages with reasonable certainty and that the trial court failed to reduce its award to McClain by the costs Kimbrough incurred in correcting the defective portions of McClain's work. We find little merit in Kimbrough's arguments. However, we have determined that the damage calculation is sufficiently flawed to require a remand for correction.

## A.

The subcontract obligated Kimbrough to pay McClain $275 for every 1,000 bricks laid and $1,000 for each of the four chimney chases called for in the plans. Based upon their understanding that the job would require approximately 78,000 bricks, the parties agreed that McClain would receive $25,450 for the work required by the contract.[7]

At the outset, McClain anticipated that the job would require five bricklayers and three laborers and would take twenty days to complete. Bricklayers earned $10 per hour, and laborers $6 per hour. Based on its total personnel costs for twenty days and the costs of gasoline and oil attributable to the job, McClain estimated that its total costs to complete the work would be $12,802. After subtracting its costs from the amount of the contract, McClain testified that its net profit would have been $12,648.

The subcontract contemplated that McClain would submit weekly draw requests based on the work performed. During the three weeks its crew was on the job, McClain's crew laid approximately 25% of the brick[8] and submitted draw requests for $6,500 (approximately 25% of the contract amount). Kimbrough paid McClain $5,850 after deducting $650, the 10% retainage authorized in the contract.

The trial court found that McClain's net profit on the job would have been $12,648. Instead of awarding McClain the full amount of its anticipated profit, the trial court deducted the progress payments McClain received and awarded McClain the difference.

## B.

■ A subcontractor may sue a contractor for damages when the contractor improperly terminates the contract after the subcontractor has partially performed. The proper measure of damages in this situation is the net profits the subcontractor would have made had it been permitted to complete the contract. *Fidelity & Deposit Co. v. Accel, Inc.*, 354 So.2d 424, 426 (Fla.Dist.Ct.App.1978); *Bruning Seeding Co. v. McArdle Grading Co.*, 232 Neb. 181, 439 N.W.2d 789, 791–92 (1989); *see also Inland Equip. Co. v. Tennessee Foundry & Mach. Co.*, 192 Tenn. 548, 556, 241 S.W.2d 564, 567 (1951) (recognizing lost profits as the proper measure of damages).

■ When lost profits are the proper measure of damages, they need only be proved with reasonable certainty, not with mathematical precision. *Swartz v. Sanders*, 56 Tenn.App. 281, 291–92, 406 S.W.2d 70, 74–75 (1966); *Black v. Love & Amos Coal Co.*, 30 Tenn.App. 377, 384–85, 206 S.W.2d 432, 435 (1947). Professor McCormick has pointed out that courts have devised three formulae with which to calculate the subcontractor's net profits:

> In this situation, three formulas have been furnished by the cases for measurement of the builder's claim: (1) The contract price (or so much as remains unpaid) less the amount that it would cost the builder to complete the job. This is the simplest and, where the builder can prove with reasonable certainty the cost of completing, the best. (2) The profit on the entire contract (total contract price less total builder's cost of construction, both expended and to be expended) plus

---

7. Apparently the parties did not contemplate that minor variations in the number of bricks used would alter the total amount of the subcontract.

8. Mr. McClain testified that his men laid 20,000 of the 78,000 bricks required for the job.

the cost of the work actually performed. (3) For the work done, such proportion of the contract price as the cost of the work done bears to the total cost of doing the job, plus, for the work remaining, the profit that would have been made upon it.

C. McCormick, *Handbook on the Law of Damages* § 164, at 641 (1935). The same formula used to determine a contractor's damages from an owner is used to determine a subcontractor's damages from a general contractor. 2 S. Stein, *Construction Law* ¶ 11.02[4][b], at 11–58 n. 222 (1990).

▮ Instead of following one of the damage calculations outlined by Professor McCormick, the court simply awarded McClain its anticipated profits on the entire contract less the full amount of the progress payments received. This calculation fails to address three relevant matters: (1) McClain's actual costs to complete the job, (2) the apportionment of the progress payments between cost and profit, and (3) the allocation of the risk that the job will take longer than originally anticipated.

Under the facts of this case, McClain's damages should not be derived from the total amount of the profits it originally planned to make on this job. The amount of these anticipated profits was based on McClain's assumption that the work would require twenty days to complete. This assumption was no longer valid when McClain stopped work because, by that time, McClain's crew had already worked fifteen days but had completed only 25% of the work. Clearly, McClain would not have been able to complete the remaining work within five days.

The record contains no proof concerning which of the parties would have absorbed the additional labor costs had McClain returned to finish the work. Since McClain

did not seek a change order or later request delay or disruption damages, we can only presume that McClain planned to absorb the increased labor costs. Had it done so, its anticipated profits would have been reduced in direct proportion to the additional labor costs.

Similarly, McClain's damages should not be reduced by the progress payments it actually received unless the payments represented profit. Mr. McClain's uncontradicted testimony was that his company's payroll expenses for the three weeks its crew was on the job exceeded its draw requests. Accordingly, the record supports only one conclusion—that the progress payments were for costs not for profit. The trial court should not have reduced McClain's damages by the amount of the progress payments.

The trial court decided this case without a jury. Tenn.R.App.P. 13(b) and 36(a) authorize us to review its decision de novo and to grant the relief warranted by law and the facts. Even though McClain has not questioned the trial court's damage calculation on appeal, we have the responsibility to apply the controlling law whether or not cited or relied upon by either party. Tenn.R.App.P. 13(b), 36(a); *Nance v. Westside Hosp.*, 750 S.W.2d 740, 744 (Tenn. 1988); *City of Memphis v. IBEW, Local 1288*, 545 S.W.2d 98, 100 (Tenn.1976).

While we favor the conservation of the judicial resources, we do not have sufficient evidence to calculate McClain's damages on our own. Accordingly, pursuant to Tenn.Code Ann. § 27–3–128 (1980),[9] we vacate the damage award and remand the case to the trial court for the calculation of the damages McClain incurred as a result of Kimbrough's unilateral termination of the contract.[10]

---

**9.** Tenn.Code Ann. § 27–3–128 provides, in part: The court shall also, in all cases, where, in its opinion, complete justice cannot be had by reason of ... oversight without culpable negligence, remand the case to the court below for further proceedings, with proper direction to effectuate the objects of the order, and upon such terms as may be deemed right.

**10.** McClain's damages should be limited to the damages stemming from Kimbrough's unilateral termination of the contract. Throughout these proceedings, McClain has not sought damages for the delay or disruption of its performance. Since it has failed to do so up to this point, it should not be permitted to do so when the case is remanded.

## C.

Finally, we find no error with the trial court's refusal to reduce McClain's damage award by the cost Kimbrough incurred in completing the contract. Kimbrough incurred these costs because of its unilateral termination of the contract which prevented McClain from correcting any defects in its work and completing the job. Since Kimbrough's material breach occurred prior to McClain's failure to complete the job, Kimbrough is not entitled to recover the cost it incurred in completing the work. *Denver Ventures, Inc. v. Arlington Lane Corp.*, 754 P.2d 785, 788 (Colo.Ct.App.1988); *John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.*, 715 S.W.2d 41, 47 (Tenn.1986).

## VI.

We affirm the trial court's decision that McClain was damaged by Kimbrough's unilateral termination of the contract. We vacate the damage award and remand the case for the purpose of assessing McClain's damages in accordance with this opinion and for any other proceedings that may be required. We also tax the costs of this appeal in equal proportions to Kimbrough Construction Company and its surety and to Harrison McClain for which execution, if necessary, may issue.

LEWIS and CANTRELL, JJ., concur.