**MAGUIRE COMPANY, INC.,**
**Counterclaim Plaintiff,**

v.

**HERBERT CONSTRUCTION COMPANY, INC., Counterclaim Defendants.**

**No. 94 Civ. 1261 (RLC).**

United States District Court,
S.D. New York.

Oct. 30, 1996.

Ross & Cohen, L.L.P. (Charles Fastenberg, Andrew L. Richards, of counsel), New York City, for Herbert Construction Company.

Martin S. Rapaport (Martin S. Rapaport, Karen Newirth, of counsel), New York City, for J.P. Maguire Company, Inc.

### AMENDED OPINION

ROBERT L. CARTER, District Judge.

This is a counterclaim action for damages resulting from breach of a subcontract concerning a construction project ("the Roof Modification Project") which involved the installation of two new cooling towers and a piping system at certain floors of the American Express Tower at 3 World Financial Center in Manhattan. Counterclaim plaintiff is J.P. Maguire Company, Inc. ("Maguire") and the counterclaim defendant is Herbert Construction Company ("Herbert"). Presently before the court is Herbert's motion for judgment as a matter of law, pursuant to Rule 50, F.R.Civ.P., or in the alternative, for a new trial pursuant to Rule 59, F.R.Civ.P.

### I.

Herbert was the general contractor for the Roof Modification Project and Maguire was Herbert's mechanical subcontractor pursuant to a written subcontract entered into in January, 1993. The subcontract was incorporated by reference into a purchase order executed by Maguire and Herbert and was dated August, 1992. (Admitted Facts, Joint Pre–Trial Order at 29). Maguire began work in or about September, 1992. Part of the work Maguire was to have performed was to join 12–inch copper pipes to 12–inch cast bronze fittings by a process known as brazing. Each bronze fitting is used to essentially join together two ends of copper pipe that have been inserted into the fitting. Inside of each fitting are metal rings that when heat from a torch is applied to them, i.e., brazed, the metal melts and spreads to fill the space between the fitting and the pipe end. The metal then solidifies so as to completely seal and join the pipe ends to the fitting. The specifications for the brazing of the fittings specified that Maguire use either Bcup–5 or Bag–3 braze metal as the metal material to seal the fitting and pipes. Maguire used Bcup–5. (*Id.* at 30).

In mid-June 1993, Maguire began testing the piping system it had installed. Leaks were discovered on some of the 12–inch fittings that Maguire had brazed to the pipes. At Herbert's request and direction, Maguire attempted to repair several fittings in place, and began installation of replacement fittings and pipe in areas where fittings had to be cut out of the system because the repairs were unsuccessful. (*Id.* at 31–32).

Maguire demanded that Herbert pay for the costs that Maguire incurred in repairing and replacing the cast bronze fittings on which leaks were observed. Herbert did not pay these costs. (*Id.* at 32). Maguire continued with the repair and replacement work until September 10, 1993 when it ceased working on the project alleging that Herbert

failed to make payment. Negotiation to resolve Maguire's claim for payment failed to resolve the dispute and Maguire and Herbert accused each other of having breached the subcontract. (*Id.* at 33). Herbert claimed that the leaks were caused by Maguire's poor workmanship in brazing the fittings and that it therefore did not have to pay Maguire's repair costs. Maguire countered that it performed in accordance with the prevailing industry standards and that Herbert breached the subcontract by refusing to pay Maguire for the repair and replacement work which was caused by Maguire's use of defective specifications.

The case came for jury trial on July 15, 1996 and lasted through July 18, 1996. The jury found for Maguire and awarded it $250,-000 in damages.

Herbert now argues that the court should grant a judgment in its favor as a matter of law because Maguire failed to present evidence to satisfy its burden of proof and failed to present evidence to support the verdict. In the alternative, Herbert argues for a new trial on the grounds that the verdict was against the weight of the evidence.

## II.

A motion for judgment as a matter of law, pursuant to Rule 50(b), F.R.Civ.P., "will be granted only if (1) there is a complete absence of probative evidence to support the verdict for the non-movant[,] or (2) the evidence is so strongly or overwhelmingly in favor of the movant that reasonable and fair minded [jurors] in the exercise of impartial judgment could not arrive at a verdict against [the movant]." *Armstrong v. Commerce Tankers Corp.*, 423 F.2d 957, 959 (2d Cir.), *cert. denied*, 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970). The district court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. *Concerned Area Residents for the Environment v. Southview Farm*, 34 F.3d 114, 120 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995). The court " 'cannot assess the weight of con-

flicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.'" *Id.* (citation omitted).

A new trial motion may be granted if "the jury has reached a seriously erroneous result, or ... the verdict is a 'miscarriage of justice' i.e.... the verdict is against the great weight of the evidence." *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir.1983). In considering such a motion, the court may weigh the evidence and need not view it in the light most favorable to the non-moving party. *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978). Such a motion will not be granted, however, "unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done." *Metromedia Co. v. Fugazy*, 753 F.Supp. 93, 96 (S.D.N.Y.1990) (Carter, J.), *aff'd*, 983 F.2d 350 (2d Cir.1992), *cert. denied*, 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993) (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2803 at 32 (1973)). A verdict may not be set aside merely because the judge would have reached a different result as the finder of fact, but only if "it is quite clear that the jury has reached a seriously erroneous result." *Bevevino*, 574 F.2d at 684 (quoting 6A *Moore's Federal Practice* ¶ 59.08[5] at 59–160 to 59–161 (1973)). The moving party has the burden to prove that it is entitled to a new trial.

## III.

At trial, Maguire alleged that Herbert had breached the subcontract by providing defective specifications—the cause of the leaking fittings—which prevented Maguire from completing performance. Maguire contended that it was damaged by Herbert's breach in the amount of $250,000, the amount allegedly promised to Maguire for performing the repair/replacement work, or at the very least, in the amount of $30,000 allegedly promised by Herbert to enable Maguire's union labor to continue to perform the repair/replacement work.

Herbert denied that the specifications were defective and claimed that the leaking fittings were caused by Maguire's poor workmanship and thus Herbert was not responsi-

ble for any of Maguire's costs related to repairing and replacing the fittings. Herbert further argued that Maguire signed a "lump-sum" subcontract under which Maguire was to be paid a set amount of money irrespective of whether there arose the need for Maguire to expend extra labor and money. Herbert therefore contended that it did not breach the subcontract and that it was also justified in ordering a stop-payment on the $30,000 check issued to Maguire since payment was conditioned on Maguire completing the project on a specified date, which Maguire failed to do.

■ Under New York law, a party seeking recovery for breach of contract must show: (1) a contract; (2) performance by the party seeking recovery; (3) breach of the contract by the other party; and (4) damages attributable to the breach. *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir.1994).

Maguire thus had the burden at trial to prove by a preponderance of the evidence that it did not breach the subcontract because it performed in a skillful and workmanlike manner; that Herbert breached because the leaks in the fittings were caused by faulty specifications given to Maguire; and, that Maguire was damaged in the amount of $250,000 because Herbert breached its promise to pay for the extra repair and replacement work or, at the very least, its promise to pay Maguire $30,000.

As to the present motion for judgment as a matter of law, Herbert contends that Maguire failed to meet its burden of proof. In particular, Herbert claims that Maguire's metallurgy expert's testimony was specula-

tive and contradictory regarding Maguire's claim that defective brazing specifications caused the leaks, and that the expert failed to consider whether the quality of Maguire's workmanship could have caused the leaks. Herbert also argues that its alleged promise to pay for the repair work was legally insufficient because there was no consideration since Maguire had a pre-existing duty to perform repairs and pay for the costs of those repairs pursuant to the subcontract. Finally, Herbert argues that Maguire was not alternatively entitled to the $30,000 promised for union labor because Maguire never met the condition on which the payment was based.

### A. Skilled Workmanship vs. Defective Specifications

■ Regarding Maguire's skilled workmanship, Maguire presented three witnesses—Maguire's field supervisor, project manager, and shop foreman, each of whom had hands-on oversight of Maguire's workmen during the time period at issue—who testified that Maguire's brazing work was approved by Herbert's agents: (1) Lucius Pitkin ("Pitkin"), a company hired to oversee Maguire's work, which marked "o.k." on each fitting brazed in Maguire's shop before it was shipped to the building for installation;[1] and (2) Bryan Parrish, an expert brazer hired by Herbert, who observed Maguire's employees as they performed the brazing and who told Maguire's field supervisor that he (Parrish) "wouldn't change a thing" in Maguire's brazing technique.[2] (Tr. at 147). The project manager also testified about his notes, taken throughout the repair/replacement work, that concerned the work performed by Maguire.

---

1. *See* Tr. at 149–50 (testimony of James Sullivan, Maguire's field superintendent; Exhs. 22 and 24 (photos of piping with "o.k." written on them in yellow crayon); *see also* Tr. at 184–85 (testimony of Tom Yarzab, Maguire's project manager) ("when the problem first surfaced [Maguire] had demonstrations of [Maguire's] technique in front of Lucius Pitkin, in front of representatives from Flagg [the manufacturer of the fittings] and ... [Bryan Parrish]"); Tr. at 284 (testimony of Al DiSabatino, Maguire's shop foreman).

2. *See* Tr. at 147; Counterclaim Pl.'s Exh. 25—Memo of 9/10/93 from James Sullivan [Maguire's field supervisor] to Christopher Maguire [Presi-

dent of Maguire] ("Mr. Bryan Parrish ... has been observing and directing the procedures used in preparation and brazing of fittings.... [and] has stated on numerous occasions that the procedures used by the steamfitters is acceptable"); Tr. at 281. Herbert contends that because this approval by Parrish occurred after the leaks were discovered, the approval is not indicative of Maguire's supposedly skilled workmanship. It is reasonable, however, that the jurors could have concluded that it was more likely than not that Maguire's technique immediately after the discovery of the leaks was the same as it was prior to the discovery.

According to these notes, on at least three occasions, Stanley Flagg Company (the fitting manufacturer), the Copper Development Association, and Pitkin observed Maguire's brazing work and offered suggestions for brazing that would preclude the occurrence of cracks. The evidence showed that these suggestions were methods for accommodating fittings that were seemingly prone to cracking, rather than methods to improve poor brazing techniques.[3]

Herbert presently contends that only approval of a leak-free *completed system*, not just the brazing, would have indicated skilled workmanship. Thus, any alleged approval of Maguire's brazing work by Herbert's agents is insignificant. This argument is specious. Herbert cannot make "leak-free" synonymous with "skillful workmanship" because a flawed complete system could be the result of either defective specifications or poor workmanship—the precise issues heard at trial.

Maguire also presented testimony at trial indicating that there were no complaints from Herbert regarding Maguire's brazing either before or after the discovery of the leaks, even when Maguire's technique was reviewed by Herbert's agents. Lastly, Maguire points to the admission at trial by Herbert's brazing expert that the occurrence

of leaks can be consistent with good workmanship and a "very good brazing job." (Tr. at 360).[4] In sum, then, the evidence provided by Maguire, with all inferences drawn in its favor, is clearly sufficient to the support the jury's finding that Maguire's work was skillful.

Regarding the defective specifications, Maguire's metallurgy expert testified that the specifications were defective because the temperature at which Bcup–5, the specified brazing material, melts and flows during the brazing process was too close to the temperature at which the bronze fittings begin to melt. (Tr. at 222–225). He further testified that this situation was compounded by the fact that there were airgaps in the fittings so that it was necessary to apply torch heat at a temperature higher than the melting temperature for Bcup–5 to completely melt and seal the pipes. The increased temperatures exceeded the melting point of the fittings and therefore caused cracks in the fittings in such a way that a leakage path to the outside surface of the fittings resulted. The observed leaks occurred as a result of these leakage paths. (*Id.*). As a result, the expert concluded that the specifications should have specified a brazing material composed of an alloy that would not cause the temperature problems associated with Bcup–5: the possi-

3. *See* Countercl. Pl.'s Exh. 14 (notes dated 7/14/93—"Flagg—observed brazing of joint ... no comments on technique"; notes dated 8/4/93—"meeting at jobsite—Flagg Co., Copper Development Assoc. ["CDA"], L. Pitkin ... advised by CDA to use 2 torches, heat pipe away from [fitting], heat up & get done as ring melts including filler metal .. if ring needs to be melted *heat may be more than fitting was designed for—result cracks*"; notes dated 8/17/93—"mtg [with Herbert], J. Sullivan ... S. Lampert [Herbert's project manager], reviewed w/ ... Brian Parrish (Am.Ex. brazing expert) has advised [Maguire] personnel—do *not* use 2 torches, cool down period not necessary—do not heat copper pipe—heat [fitting] ... if [fitting] cracks—'*bad fitting*'") (emphasis added).

4. Herbert's brazing expert conclusively testified that cracks are a sign that there has been improper heating applied during the brazing process and that it means there has been poor workmanship. (Tr. at 327, 329–330). However, he also testified that while the subcontractors who replaced Maguire on the project, after Maguire ceased performing, performed brazing of a very good quality, these replacement subcontrac-

tors also had to re-braze leaks from cracks that resulted from their brazing:

Q: In your opinion, did they [the replacement subcontractor] do a good brazing job?
A: Yes; they done a very good brazing job.
Q: Were you there until the completion of [the replacement subcontractor's] work?
A: Yes, sir, I was. I was there until the final testing and put on line.
Q: After [the replacement subcontractor] finished their brazing, was the system tested with pressure?
A: Yes, it was.
Q: Did it pass the tests?
A: Yes, it did. [They] had some mechanical leaks. [They] fixed those....
Q: You mentioned they fixed some leaks. What was entailed in fixing the leak?
A: ... [They] had a couple of *brazed leaks where there was improper silver [i.e., Bcup–5] flow, which can happen.* You cannot necessarily always see it with the naked eye. We reflowed, reheated the fitting and reflowed the silver with no problems. (emphasis added).
Tr. at 360.

bility that cracks and leaks would occur from too similar melting points of the braze material and the fittings.

Herbert presently contends that the expert "failed to testify with any degree of certainty that the leaks in fact were caused by the chain of events" described above, (Countercl. Def's Mot. for J. as Matter of Law at 6), because the expert said that he "couldn't confirm or deny" the truth of a report by one of Herbert's witnesses that the leaks were caused by Maguire's poor workmanship, not defective specifications. (Tr. at 210). Herbert also claims that the expert's analysis was scientifically improper because he testified that he reached his conclusion that the specifications were defective without considering whether Maguire properly applied heat to the fittings. (Tr. at 244–46). However, the jury need not have relied solely upon Maguire's expert's testimony in deciding that Maguire was not the cause of the leaks; and the court need not, and cannot, discern whether this was in fact the jury's thinking. The court need only determine whether it was reasonable for the jury to reach such a conclusion and cannot pass on the credibility of the witnesses. *Concerned Area Residents for the Environment v. Southview Farm,* 34 F.3d at 120. By charging that the expert's testimony was speculative, contradictory, and indicative of poor scientific analysis, Herbert simply assails the credibility of the expert and fails to overcome its burden to show that there was a complete absence of probative evidence to support the jury's verdict regarding the defective specifications and Maguire's workmanship.

## B. Herbert's Promise To Pay for the Repair/Replacement Work

At trial, Herbert claimed that it made clear to Maguire that it would not pay for the repair/replacement work until after its agent investigated whether the leaks were caused by Maguire's poor workmanship. Maguire contended that it was promised payment when the leaks were discovered and before Herbert mentioned that it wanted to investigate the leaks. (Tr. at 42, 91).

Herbert now raises the argument that its alleged promise to pay Maguire was legally insufficient because Maguire had a pre-existing duty to perform the repair/replacement work. Thus, there was no consideration for Herbert's promise and it cannot be enforced. *See Fafoutis v. Lloyd Lyons,* 149 A.D.2d 565, 540 N.Y.S.2d 20, 21 (2d Dept.1989) ("a promise to comply with a pre-existing legal duty is not adequate consideration upon which a valid contract may be based"). However, because Herbert should have made this argument prior to trial, Herbert has waived the opportunity to do so now. In any event, the argument fails for the following reason.

In examining the sufficiency of the alleged promise, the court, ordinarily, would examine whether Herbert and Maguire had covenanted to perform pre-existing obligations once the leaks were discovered; in other words, did both parties do or promise to do something in addition to their pre-existing duties? *See e.g., Care Travel Co., Ltd. v. Pan American World Airways, Inc.,* 944 F.2d 983, 990–91 (2d Cir.1991). Under the contract, Maguire had the obligation to perform all work specifically set forth in the contract

> as well as any and all work incident or related thereto, including but not limited to that work reasonably necessary for a complete and proper Project, or which is necessary to have a properly working and totally acceptable system and Project.

§ 3.1, Subcontract Agreement, Exh. B, Countercl. Def.'s Mot. for Judgment as Matter of Law. Section 9.4 of the Subcontract Agreement also provides that:

> The Subcontractor shall, within 24 hours after receiving specific written notice from the Contractor, commence to take down and remove any designated portion of its work which is condemned, disapproved, or is questioned as not being in strict compliance and conformity with the requirement of this Contract ... The *Subcontractor shall promptly, at its own expenses, correct and rectify same.* (emphasis added).

Herbert had the obligation to pay Maguire for the work Maguire agreed to perform and to not do anything that would prevent Maguire from performing.

However, as Herbert points out, if Herbert breached the subcontract, i.e., gave Maguire defective specifications, whether Herbert's promise to pay for the repair/replacement work comes within the parties' pre-existing duties is no longer relevant. The alleged promise would be enforceable because there was a new bargained-for exchange of promises: Maguire would perform the repair/replacement work and Herbert would compensate Maguire. Moreover, any work performed by Maguire to remedy Herbert's breach could not be considered within the meaning of Section 9.4 of the subcontract since it was Herbert's fault that Maguire's work was "condemned, disapproved, or ... questioned." (Exh. B—Subcontract Agreement, Countercl. Def.'s Mot. for J. as Matter of Law).

■ Maguire therefore would have to show at trial that Herbert breached and that Herbert promised to pay for the repair/replacement work. As discussed above, Maguire presented evidence sufficient for a reasonable jury to find that Herbert committed a breach. Remaining for the court's examination, therefore, is whether it was reasonable for the jury to find that Herbert promised to pay for the repair/replacement work. At trial, Maguire presented evidence that Herbert promised to pay for the work, Tr. at 51–53, 105; and that Herbert signed the time tickets it directed Maguire to keep as a record of labor and hours expended on the repair/replacement work until a purchase order could be drawn up for Maguire to bill against, Countercl. Pl's Exhs. 13 and 15.[5] Herbert does not presently argue that it disputed this evidence at trial, but instead relies on its argument that there is no legal basis to enforce the promise. Because the lack of consideration argument is not applicable since Herbert was found to have breached, and Maguire's evidence was sufficient to support the jury's finding that Herbert promised to pay Maguire, the jury's verdict will not be disturbed on this basis.

■ Similarly, Herbert's "lump-sum" argument, advanced at trial, does not overcome the jury's finding that Herbert breached. Herbert contended that Maguire knowingly signed a lump-sum contract and thus any "extra work"[6], i.e. the repair/replacement work, that came within the scope of Maguire's subcontract was not compensable.[7] However, the need to perform extra work due to the other party's fault does not come within the constraints of the lump-sum doctrine. *See Sturdy Concrete Corp. v. Nab Constr. Corp.*, 65 A.D.2d 262, 411 N.Y.S.2d 637, 641 (2d Dept.1978).

## C. Herbert's Promise to Pay Maguire the $30,000 in Union Benefits

Because the court finds that the jury's verdict that Maguire was damaged by Herbert's breach in the amount of $250,000 was reasonable and supported by the evidence, the court need not reach Herbert's challenge to the verdict regarding the alleged $30,000 promise.

## IV.

In moving for a new trial, Herbert challenges Maguire's witnesses as self-serving, argues that there were contradictions and deficiencies in Maguire's testimonial evidence

5. Exhibit 15 is a letter form Maguire to Stan Lampert, Herbert's project manager, reminding Herbert that Maguire needed a purchase order for the repair/replacement work and attaching the signed time tickets.

6. "Extra work has been defined as something necessarily required in the performance of the contract which arises from conditions which could not be anticipated." *Savin Brothers, Inc. v. The State of New York*, 62 A.D.2d 511, 405 N.Y.S.2d 516, 519 (4th Dept.1978), *aff'd,* 47 N.Y.2d 934, 419 N.Y.S.2d 969, 393 N.E.2d 1041 (1979).

7.

> Where one agrees to do, for a stated sum, a thing possible to be performed, he is not entitled to additional compensation merely because he encounters unforeseen difficulties.... Recovery cannot be had for extra work which actually falls within the [sub]contract or the plans and specifications ... but recovery may be had for work outside the contract where the [sub]contractor was in fact specifically ordered to do work not within the scope of that called for by the [sub]contract.
>
> *Savin Brothers, supra* note 6, 405 N.Y.S.2d at 519 (citations omitted).

regarding causation,[8] and assails Maguire's evidence that it was entitled to payment for the full two-and-a-half month period of repair/replacement work as inconsistent.[9] While contradictions and inconsistencies may be meaningful to the jury as finder of fact, Herbert's present arguments go no further than to express Herbert's dissatisfaction with how the jury weighed the evidence in this case. Herbert is not entitled to a new trial without showing that there was prejudicial error or that the verdict was a seriously erroneous result. *See Metromedia Co. v. Fugazy, supra,* 753 F.Supp. at 96; *Bevevino, supra,* 574 F.2d at 684.

### Conclusion

Counterclaim defendant Herbert Construction Company's motion for judgment as a matter of law under Rule 50, F.R.Civ.P, is denied. Herbert's motion for a new trial pursuant to Rule 59, F.R.Civ.P., is also denied. The judgment of the jury stands.

IT IS SO ORDERED.

---

8. Herbert's arguments on this point are explained, *supra,* at Section III–A.

9. At the same time, Maguire interprets Herbert's testimonial evidence as inconsistent regarding Herbert's contention that Maguire's workmanship was below industry standards. (Countercl. Pl.'s Memo in Opp'n to Mot. at 24–26).