OPINION OF THE COURT
 

 Bellacosa, J.
 

 This case presents the puzzle of when the one-year limitations period for suing a surety on a public improvement construction bond begins to run, within the meaning of State Finance Law • § 137 (4) (b). Also implicated is whether contractual provisions in a subcontract can effectively toll the statutory time period.
 

 We conclude that the one-year period starts to be counted as of the time when a subcontractor has demanded final payment from the general contractor with whom it contracted, and 90 days have passed since the subcontractor ceased work on the project. This time frame may not be extended or overridden by any provisions of the subcontract.
 

 I.
 

 This controversy arises out of a public improvement contract for the construction of a health care facility at Green Haven
 
 *129
 
 Correctional Facility. Eberhard Construction Company, the general contractor, held the prime contract with the State of New York. Plaintiff Windsor subcontracted with Eberhard to provide and erect all structural steel for the project, at a cost of $404,000.
 

 Defendant General Accident provided the statutory payment bond for the project. The document stated that it was a Comptroller’s Form Bond issued pursuant to State Finance Law § 137 and that “all rights and remedies on this bond * * * shall be determined in accordance with the provisions, conditions and limitations of said Section.”
 

 Windsor started its work on the project on April 12, 1994. The State terminated its prime contract with Eberhard on March 28, 1995. This resulted in the termination of the subcontract with Windsor and in Windsor’s cessation of work on the project. Windsor’s president later asserted in an affidavit:
 

 “Prior to the termination, Eberhard had already fallen behind in payments to Windsor. Following the termination, I contacted Eberhard on several occasions in an attempt to secure final payment, all to no avail.”
 

 On March 31, 1995, three days after the State terminated the contract with Eberhard, Windsor wrote to General Accident, stating:
 

 “As of this date we are owed the amount of $211,192.00. Plus, we are awaiting charges from our erector for changing opening and delays.
 

 “For you [sic] convenience we have hereby attached a copy of our request for payment sent to Eberhard Construction.
 

 “Please regard this as a notice for payment. Please be kind enough to inform us as to when we can expect the monies due to us.”
 

 At all relevant times, Eberhard and General Accident denied owing Windsor additional compensation and rejected Windsor’s payment demands. Indeed, Eberhard took the position that Windsor’s failure to fulfill its obligations under the subcontract caused the State to terminate the prime contract with Eberhard.
 

 On April 19, 1995, Windsor filed a notice of mechanics’ lien in the amount of $214,036.36, which Windsor indicated was
 
 *130
 
 due on March 1, 1995. The lien was discharged when Eberhard and General Accident posted a $250,000 bond, separate from the initial statutory payment bond.
 

 On April 19, 1995, Windsor also filed a demand for arbitration against Eberhard, seeking the $214,036.36. Windsor immediately notified General Accident of the arbitration, and General Accident participated in the proceedings to the extent that it joined Eberhard in the attempt to prove Windsor had breached its subcontract; General Accident also asserted that Windsor was responsible for General Accident’s own losses incurred as a result of its having to arrange to complete the project following the termination of Eberhard, its principal.
 

 Windsor won an arbitration award against only Eberhard on April 2, 1996 in the sum of $231,678.20. Supreme Court confirmed the award and, on December 24, 1996, entered a $255,130.22 judgment against Eberhard. Unfortunately for Windsor, Eberhard was apparently insolvent by this time. Windsor, thus turned its recovery effort toward General Accident, which denied its demand for payment.
 

 In early 1997, Windsor sued General Accident, seeking $255,130.22, the amount of the judgment entered against Eberhard. General Accident raised the Statute of Limitations as an affirmative defense (State Finance Law § 137 [4] [b]), and Supreme Court granted summary judgment to General Accident on this ground.
 

 The Appellate Division disagreed. It relied on specific provisions of Windsor’s subcontract and found that none of the “final payment” provisions in the subcontract could operate to raise a time bar. As pertinent to this appeal, the Appellate Division unanimously reversed and granted that part of Windsor’s motion seeking summary judgment on its first cause of action pursuant to the payment bond.
 

 This Court granted General Accident leave to appeal. We now reverse, reinstate the Supreme Court ruling, and dismiss Windsor’s complaint.
 

 II.
 

 State Finance Law § 137 (4) (b) states:
 

 “No action on a payment bond furnished pursuant to this section shall be commenced after the expiration of one year from
 
 the date on which final payment under the claimant’s subcontract became due”
 
 (emphasis added).
 

 
 *131
 
 Section 137 (3) of State Finance Law provides that anyone who has furnished labor or material pursuant to a subcontract made directly with the contractor and who is not paid within 90 days “after the day on which the last of the labor was performed or material was furnished * * * shall have the right to sue” on the surety payment bond.
 

 Together, subdivisions (3) and (4) set the beginning and endpoint measurements for a lawsuit against a surety in these circumstances. They establish a date upon which the claim against a surety becomes ripe (State Finance Law § 137 [3]) and a date after which time has run out for an action on the claim (State Finance Law § 137 [4] [b]). The pinpointing of this latter date is the operative question in this case; it hinges on the definition of “the date on which final payment under the claimant’s subcontract became due” (State Finance Law § 137 [4] [b]).
 

 This date is critical because the lawsuit must be started within one year from that fixed point. In this case, Windsor proffers as the date upon which this one-year period begins the date of the favorable arbitration determination. To so calculate this date, it relies on a combination of the final payment provision (“when the Subcontractor’s work is fully performed in accordance with the requirements of the Contract Documents, the Architect has issued a Certificate for Payment covering the Subcontractor’s completed Work and the Contractor has received payment from the Owner”) and the arbitration clause (“[a]ny controversy or claim between the Contractor and the Subcontractor arising out of or related to this Subcontract, or the breach thereof, shall be settled by arbitration”). We reject Windsor’s contract-based calculation of the measuring date.
 

 Our holding focuses principally on when the one-year limitations period begins to run, within the meaning of State Finance Law § 137 (4) (b). We conclude that it starts at a point when a subcontractor who has directly contracted with the general contractor has submitted an invoice for final payment (or given the functional equivalent thereof) and 90 days have passed since the subcontractor has ceased to work on the project. Contractual provisions between the subcontractor and general contractor cannot modify this starting-point date. The necessity to incorporate and satisfy all these considerations is supported by the statute, as well as precedent of this Court.
 

 A.
 

 The language — “date on which final payment under the claimant’s subcontract became due” — stems from a bill recom
 
 *132
 
 mended by the Law Revision Commission in 1962. The Commission suggested that an action upon the bond be commenced within one year after the date on which the claimant performed the last of the labor or supplied the last of the material “except that if the beneficiary is a subcontractor of the contractor, action on the bond must be commenced within one year from the date on which final payment under the subcontract became due” (1962 Report of NY Law Rev Commn, at 186). The initial bill introduced on the Commission’s recommendation was withdrawn for study of criticisms.
 

 In 1963, a new bill was recommended by the Commission. Like the original bill, it included a provision regarding suit against a surety “like that of the [Federal] Miller Act * * * It adds an exception, however, under which, if the claimant is a subcontractor, the one year period runs from the date on which final payment under the subcontract became due” (1963 Report of NY Law Rev Commn, at 105). In 1964, the 1963 recommendations of the Commission were adopted in substantially unchanged form and State Finance Law § 137 (4) (b) was enacted to provide:
 

 “No action on a payment bond furnished pursuant, to this section shall be commenced after the expiration of one year from the date on which the claimant performed the last of the labor or furnished the last of the material for which such action is brought, except that if the claimant is a subcontractor of the contractor, no such action shall be commenced after the expiration of one year from the date on which final payment under the subcontract became due.”
 

 Legislative history indicates that in 1980, this subdivision was amended into its current version, specifically to render the original “exception” for subcontractors universally applicable to all claimants (see, Mem of Assembly Member Goldstein, Bill Jacket, L 1980, ch 360). This change enabled secondary subcontractors (sub-subcontractors) to pursue an action based on a claim within one year after final payment is due, rather than within one year after they have completed their work, because the one-year period from completion of work was seen as too stringent a limitation on them
 
 (see, id.).
 
 “Frequently these [secondary sub-] contractors finish their work more than a year before payment is due them and thus when payment is received they have no recourse should such payment not be to their satisfaction”
 
 (id.).
 

 
 *133
 
 Direct subcontractors were not seen as typically having a problem with the point of final payment occurring too long after their date of final work on the project. Indeed, it appears that a subcontractor may even seek final payment
 
 before
 
 the subcontractor leaves the project site
 
 (see, Legnetto Constr. v Hartford Fire Ins. Co.,
 
 92 NY2d 275 [final invoice sent to contractor on June 2, 1994; final performance of work on the project on July 30, 1994]). In such an instance, the combined operation of State Finance Law § 137 (3) and § 137 (4) (b) would shorten the subcontractor’s time within which to sue on the bond.
 

 For example, if the claim cannot mature until 90 days after the date of last work performed, but final payment was demanded as due before this date of last work performed, then a claimant may lose at least 90 days of its statutory one-year limitation. This diminishment conflicts with the intent of the 1980 amendments, which, although they addressed a variation on this diminishment of time in which to sue, essentially sought to insure that all levels of subcontractors would have a full year in which they could sue on the bond.
 

 Here, because the project was terminated by the State, Windsor’s demand for final payment occurred virtually simultaneously with its date of final performance. Yet, its ability to sue the surety did not accrue until 90 days after its date of final performance. This case provides a prime reason for holding that both subdivisions (3) and (4) of State Finance Law § 137, are implicated in tandem.
 

 B.
 

 Legnetto
 
 (92 NY2d 275, supra) provides helpful guidance with respect to the Statute of Limitations issue presented here. In that case, the parties disputed whether the subcontractor had adequately performed its work under the contract, and it was undisputed that the contractor had failed to pay the subcontractor the full amount due under the subcontract. Thus, the question whether the contractor would actually pay the subcontractor did not change the fact that final payment to the subcontractor had legally become due. At that point and circumstance, the statutory formula takes over and controls
 
 (see, Sehuler-Haas Elec. Co. v Aetna Cas. & Sur. Co.,
 
 40 NY2d 883, 885;
 
 see also, Sturdy Concrete Corp. v NAB Constr. Corp.,
 
 65 AD2d 262, 271,
 
 appeal dismissed
 
 46 NY2d 938),
 

 Here, Windsor’s president asserted that Windsor considered final payment due as of at least March 31, 1995, yet Windsor
 
 *134
 
 did not sue on the bond until nearly two years later, on January 2, 1997. Windsor recognizes this bind and tries to wriggle out of it through a novel calculation. On its theory, the interplay of the final payment and arbitration provisions would allow Windsor to measure the one-year limitations period for lawsuit only after and from the arbitration decision in Windsor’s favor. This is unpersuasive for interpretative and policy reasons, including that this approach would override the statutory formula.
 

 Windsor’s strategic actions belie the legal merit of its current position. Windsor itself was asserting that final payment was due, despite the fact that the final payment events delineated in the subcontract had not occurred and the project had been terminated. Windsor’s “new logic” falters over the premise that payment may become legally due to the subcontractor before it must be actually paid to the subcontractor. Additionally, the subcontract here provides that the arbitration provision “shall not be deemed a limitation of rights or remedies which the Subcontractor may have under * * * applicable labor or material payment bonds.” Thus, if courts are to look at the contract at all, that examination here further supports General Accident’s assertion that the date when final payment becomes due is not determined by the date the arbitration is resolved. Indeed, the triggering date for the limitations period should not be pegged to so uncertain an event with its usual confirmation steps and review potentialities.
 

 Instructively, in
 
 Legnetto,
 
 this Court refused to turn to the terms of the contract to determine whether the bond could be interpreted as having a Statute of Limitations greater than one year. The bond was silent as to its Statute of Limitations and because the bond itself did not contain provisions more ample than the statute, the specific limitations period provided by the statute was given full effect.
 

 That is so here, too. The bond provided by General Accident clearly incorporates the one-year limitations period from the statute; the statute is also specifically referenced on the face of the bond. According to
 
 Legnetto,
 
 and contrary to the theory Windsor proposes and the rationale that the Appellate Division adopted, we must refuse to look beyond the face and terms of the bond to the contract provisions. To recalculate the Statute of Limitations’ starting point and duration on that basis, as applied to this controversy, is not supportable.
 

 We observe that this case yields the ironic result of a subcontractor being shut out from a timely lawsuit by the very
 
 *135
 
 statute meant generally to protect the rights of subcontractors. However, the Legislature has clearly made a conscious policy decision with respect to public improvement projects. It defines and delimits the remedy by requiring prompt payment, pursuant to mandatory payment bonds, in a manner that is fair to claimants, as well as consistent and reasonably definitive as to the duration of the surety’s litigation exposure
 
 (see,
 
 Budget Report, Bill Jacket, L 1980, ch 360 [State Finance Law § 137 (4) “impose(s) a * * * period of limitations, noncompliance with which bar(s) a claim on the payment bond]).
 

 There are also strong policy reasons for not reading contract clauses to interject an open durational set of events into this statute. That practice would undermine the essential purpose of the limitations period and would effectively circumvent the intent of the Legislature in this respect
 
 (see generally,
 
 Bill Jacket, L 1964, ch 700; Bill Jacket, L 1980, ch 360). We cannot, by adroit construction of the statute that sidesteps its purpose, as well as our guiding precedents, countenance a sympathetic escape hatch for a particular subcontractor’s claim under these circumstances. That would unjustifiably damage the desirable definiteness fabric and principle of this statutory formulation. The adverse impact on the construction industry in forestalling prompt, fair resolution of disputes growing out of this vast, complicated commercial enterprise contraindicates the theory advanced by Windsor, and adopted by the Appellate Division.
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, and the complaint should be dismissed.
 

 Chief Judge Kaye and Judges Smith, Levine, Ciparick, Wesley and Rosenblatt concur.
 

 Order reversed, with costs, plaintiff’s motion for summary judgment denied and defendant’s cross motion for summary judgment dismissing the complaint granted.