IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 9, 2002 Session

## DUDLEY C. EASTBOURNE, ET AL. v. ROGER BRUMITTE D/B/A ROGER BRUMITTE CONSTRUCTION

**Appeal from the Chancery Court for Loudon County**
**No. 9656     Frank V. Williams, III, Chancellor**

**FILED MARCH 18, 2003**

**No. E2002-00068-COA-R3-CV**

In this appeal from the Chancery Court for Loudon County the Appellant, Roger Brumitte d/b/a Roger Brumitte Construction, argues that the Trial Court erred in awarding the Appellees, Dudley C. Eastbourne and wife Barbara A. Eastbourne, damages for defects in the construction of their home. We affirm the judgment of the Trial Court as modified and remand for enforcement of the judgment and collection of costs below.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified; Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and D. MICHAEL SWINEY, JJ., joined.

Christopher W. Martin and Michael P. McGovern, Knoxville, Tennessee, for the Appellant, Roger Brumitte, d/b/a Roger Brumitte Construction

John Carson, III, Madisonville, Tennessee, for the Appellees, Dudley C. Eastbourne and wife, Barbara A. Eastbourne

## OPINION

In September of 1997 Roger Brumitte d/b/a Brumitte Construction (hereinafter, " Mr. Brumitte") entered into a construction contract with the Eastbournes for the construction of a lake front house in the Tellico Village Subdivision in Loudon County. It appears that the documents governing the specifics of construction which were agreed to by the parties consisted of a one page contract, architectural drawings/plans, a list of specifications prepared by Mr. Eastbourne and change orders executed after construction began.

Although the Eastbournes were living in Minnesota when construction of the house began, they returned to Tennessee on a couple of occasions to check on the progress of construction in January or February of 1998 before moving here permanently shortly thereafter.

As construction continued the Eastbournes expressed dissatisfaction with various elements of Mr. Brumitte's work and disputes arose between the parties which culminated in the Eastbournes' dismissal of Mr. Brumitte in early November of 1998. Thereafter, the Eastbournes employed another contractor, Gary Alcorn, to complete the home and remedy perceived defects.

On November 19, 1998, the Eastbournes filed a complaint against Mr. Brumitte in the Loudon County Chancery Court for damages in a then undetermined amount not to exceed $250,000.00. The complaint asserted that Mr. Brumitte was in material breach of the parties' agreement in the following respects:

> (a) the house has not been constructed in accordance with the plans submitted; and
> (b) the house has not been constructed in accordance with the specifications submitted; and
> (c) the house has not been constructed in accordance with standard practices; and
> (d) the house has not been constructed within the time represented by the Defendant.

On January 22, 1999, Mr. Brumitte filed an answer and counter-complaint by which the above assertions were denied. The counter-complaint further charged the Eastbournes with breach of contract by reason of their failure to pay sums which Mr. Brumitte asserted were due him for "labor, materials and other work performed on the job." In consequence of this alleged breach of contract Mr. Brumitte's counter-complaint requested damages in the amount of $92,175.14.

The case was tried without a jury in August of 2001. After presentation of proof and argument of counsel, the Trial Court found that, as a result of Mr. Brumitte's breach of contract, the Eastbournes sustained damage to their home for which they should be awarded a judgment in the amount of $60,000.00. The following day the Court notified the parties by letter of its decision to increase the amount of judgment to $74,514.50. The Court entered its final judgment *nunc pro tunc* on October 10, 2001, awarding the Eastbournes $74,514.50. The judgment further dismisses Mr. Brumitte's counter-complaint against the Eastbournes with full prejudice. Mr. Brumitte filed a motion to alter, amend and reduce judgment on November 9, 2001; however, this motion was denied. On January 2, 2002, Brumitte filed notice of appeal.

The issues presented in this case are restated as follows:

1. Should Mr. Brumitte be absolved of liability for failure to correct defects in the Eastbourne's house upon grounds that he was either not given notice of such defects or was prohibited from correcting them?

2. Does the evidence presented in this case indicate that the amount of damages awarded to the Eastbournes was either excessive or inadequate?

In a non-jury case such as this one our standard of review is *de novo* upon the record with a presumption that the findings of the Trial Court are correct absent a preponderance of evidence to the contrary. See T.R.A.P. 13(d). No such presumption exists as to the Trial Court's conclusions of law. See *Hawk v. City of Westmoreland*, 960 S.W.2d 10 (Tenn. 1997). We further note that, as a general rule, this Court does not pass on the credibility of witnesses. A trial court, having seen and heard the witnesses testify, is in the best position to determine the witnesses' credibility. *Bowman v. Bowman*, 836 S.W.2d 563 (Tenn. Ct. App. 1991).

The first issue we address is whether Brumitte should be relieved of liability for defects in the Eastbournes' house upon grounds that he was either not given notice of such defects or was prohibited from implementing their correction.

Mr. Brumitte cites *Carter v. Krueger*, 916 S.W.2d 932 (Tenn. Ct. App. 1995) for the proposition that a contracting party's failure to give notice of defects and afford an opportunity to correct such defects constitutes a breach of contract. Mr. Brumitte also cites *McClain v. Kimbrough Construction Co.,* 806 S.W2d 194 (Tenn. Ct. App. 1990) for the proposition that a contracting party has an affirmative duty to give notice of defective work and allow an opportunity to correct such work before terminating the contract.

In his brief Mr. Brumitte maintains that the Eastbournes' complaints regarding construction of the house fall into two categories - "complaints that were never called to his attention" and "complaints that arose while Brumitte was on the job, but which he was specifically instructed not to address."

With apparent reference to the first of these two categories, Mr. Brumitte observes in his brief that the Court held him responsible for "the cost of cross-bracing the roof trusses, uneven load bearing walls which caused the floors not to be level, improper installation of porch columns, and cracks in the flooring and interior columns." However, Mr. Brumitte contends that "[a]ll these problems arose after Mr. Eastbourne brought in a series of experts" and "the experts reports were dated at or about the time Brumitte was dismissed from the job." Mr. Brumitte asserts that he was advised in correspondence from Mr. Eastbourne's attorney dated September 21, 1998, that experts were reviewing the house and their reports would be shared with him at a later date. However, Mr. Brumitte maintains that he had not received any of these reports as of the time of his dismissal.

We disagree that the record supports Mr. Brumitte's contention that all of the above delineated problems arose after experts were consulted and it appears from our review of the record that they were, in large part, problems Mr. Brumitte should have been aware of even absent notification by the Eastbournes. In any event, to the extent that the Eastbournes neglected to notify Mr. Brumitte of any of these problems, our analysis of *McClain v. Kimbrough Construstion Company*, *ibid.* persuades us that under the facts of this case they were not obligated to do so.

In *McClain* a general contractor, Kimbrough, entered into a subcontract with McClain, a masonry company, to perform brick work on a condominium project in Nashville. As the project proceeded disputes arose between McClain and Kimbrough regarding various aspects of the brick work. McClain had laid approximately one fourth of the bricks required for completion when they were forced to stop work because Kimbrough had not completed grading around the buildings. Although the parties agreed that McClain could work on another job and that Kimbrough would call McClain back when the brick work could be completed, McClain was not called back. Instead, without notice to McClain, another brick mason was hired to complete the brick work and repair or replace portions of McClain's work. McClain filed suit against Kimbrough for breach of contract

The trial court in *McClain* determined "that Kimbrough breached its contract with McClain by interfering with McClain's work and by failing to give McClain an opportunity to correct its defective work or to complete the job before hiring another brick mason." We affirmed the ruling of the trial court, however, in doing so we noted as follows at pages 198 and 199:

> Under the facts of this case, we find that Kimbrough had a duty to give McClain notice and a reasonable opportunity to correct its defective work before terminating the contract. Kimbrough's failure to give McClain notice constitutes a material breach *unless Kimbrough was excused from performing its obligations under the subcontract.*
>
> *Only McClain's uncured material failure to perform its own contractual obligations would have excused Kimbrough from performing its remaining obligations.*(emphasis added)

We then noted various factors set forth at section 241 of the Restatement (Second)of Contracts (1979) which are deemed significant in determining whether a party's failure to perform is material. Among these factors are "the extent to which the injured party will be deprived of the benefit which he reasonably expected" and "the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances." In light of these factors, it is apparent in the case now before us that Mr. Brumitte materially failed to perform his contractual obligations and, accordingly, to the extent they did not do so, the Eastbournes were excused from the duty to provide notice and an opportunity to correct with regard to the problems indicated by Mr. Brumitte in his brief. In this regard we note the following with respect to some of the defects in the house which were brought to Mr. Brumitte's attention and his response:

1. Foundation - Although the house plans provided that the basement walls would be reinforced with rebar and that cavities in blocks composing the foundation would be filled, this was not done. Upon her inspection of the house in January or February of 1998, Ms. Eastbourne noticed these omissions and brought them to the attention of Mr. Brumitte:

    A  I spoke with Mr. Brumitte, Roger, about it. And he said, "It's not necessary."

And I said – he says, "Why don't we just leave it that way. "

And I said, "No. I want you to go according to the plans. I want you to go by the specifications of the plans because it makes for a stronger house."

Despite Ms. Eastbourne's complaint and a subsequent written reminder from Mr. Eastbourne in a punch list provided to Mr. Brumitte in September of 1998, the defects in the foundation were never corrected.

2. Windows - Although the plans show all the windows at the same elevation when the house was being framed, Ms. Eastbourne noticed that the windows were at different levels and brought this to Mr. Brumitte's attention. The problem was never corrected. During the course of trial the Trial Court inspected the house and noted in its memorandum opinion that the windows were not the same height and were too close to the floor.

3. Brick work - Ms. Eastbourne testified that when the brick was laid on the exterior of the house she was shocked by its appearance and advised Mr. Brumitte of her dissatisfaction. He told her not to worry about it, that it hadn't been cleaned yet and that it would "all be taken care of." Max Cook, a consulting engineer and building inspector who performs pre-purchase home inspections, testified that the brick work on the Eastbourne's home was the "worst brick work that I had ever seen in my life. .... It was just horrible, the exterior brick work, the sloppiness. ... [T]here was areas of mortar all over the brick work all around the house. There was very poor fitting joints." Mr. Cook further testified that the only way to remedy problems with the brick work would be to remove the brick and relay it. Mr. Eastbourne testified that the brick layers just wanted to patch up the brick. "It was much more extensive work to do and they weren't ready to address that." Mr. Brumitte insisted in his trial testimony that, on a scale of one to ten, with ten representing excellent work, the brick work on the Eastbournes' house was an eight. The implication of Mr. Brumitte's testimony is that he continues to deny significant defects in the brick work.

4. Interior doors - The specifications stated that the interior doors would be "six panel wood doors"; however, Ms. Eastbourne discovered that when the doors were hung they were not wooden doors, but rather pressed Masonite.

Q. What did you do when you found out that they weren't wood?

A. I complained to Mr. Brumitte.

Q. What was his response?

A. Well, "They're fine. They're going to be just find.[sic] You don't need hardwood doors." And I said, "But that's what we contracted for, those hardwood doors." I got one hardwood door. One. And that's the outside door."

5. Mis-positioned toilet - Several witnesses confirmed that a toilet in one of the downstairs bathrooms was mis-positioned. Mr. Cook testified that the toilet "was just left there too far out from the wall. And not only did it look terrible, the door – the bathroom door wouldn't open completely. It hit the toilet, the front of the toilet bowl." Ms. Eastbourne testified that she advised Mr. Brumitte of this problem.

Q. Did you address that with Mr. Brumitte?

A. Yes, I did. And he told me, he said, "Well, you don't need to worry." He laughed. He said, "You can build a cabinet around that gap." And I said, "Well what about the door?" And he says, "Well, you can still get in the door."

Q. What did you have to do to repair that, ma'am?

A. We had to take the – we had to tear it all out. And you can see that man had to reset it and tear up the tile and move it back.

In view of these and other defects which were brought to Mr. Brumitte's attention and which he failed to acknowledge and correct it is our determination that he materially failed to perform his contractual obligations and the Eastbournes were not subsequently required to give him notice and an opportunity to repair those defects specified in his brief.

Mr. Brumitte also asserts that there were complaints that arose while he was working on the house which he was instructed not to address. The only such complaint specified by Mr. Brumitte in his brief related to the brickwork. Mr. Brumitte states that Mr. Eastbourne instructed him not to do any touch up or repair of the brick after the brick had been cleaned. The record shows that these instructions were given by Mr. Eastbourne in late September of 1998. However, as noted in the punch list provided by Mr. Eastbourne to Mr. Brumitte and dated September 22, 1998, the complaints about the brickwork had already been discussed for months. During those months apparently the only remedy offered by Mr. Brumitte was to clean the brick or patch it and, as previously noted, expert testimony was presented that the only way to remedy the brick problem was to remove the brick and relay it. It is our determination that Mr. Brumitte had adequate opportunity to repair the brickwork prior to Mr. Eastbourne's instructions, but would not concede that the extent of work necessary to remedy the problem was, in fact, necessary. This is confirmed by Mr. Brumitte's previously noted testimony that on a scale of one to ten the quality of the brick work in the Eastbourne's house was an eight.

We next address the issue of whether the Trial Court's award of damages in the amount of $74,514.50 was appropriate.

The record indicates that the Trial Court calculated the amount of the damage award in this case as follows. The Court first added $413,743.00, the agreed upon cost of construction as set forth

in the original contract, and $28, 561.50, the total additional amount the Eastbournes agreed to pay as shown by change orders. The Court determined that the sum of these two amounts, $442,304.50, constituted the total amount the Eastbourne's were contractually obligated to pay for construction of their house. The Court then noted that the Eastbournes, in fact, paid $446,819.00, consisting of $360,000.00 paid to Mr. Brumitte prior to his dismissal plus $86,819.00 paid to Mr. Alcorn to repair defects in the house and complete its construction. Accordingly, the Court found that the Eastbournes paid $4,514.50 more for the house than they had contracted to. The Court further noted that the Eastbournes sustained damage to their home based upon Mr. Brumitte's breach of contract and determined that they should have a judgment in that regard in the amount of $60,000.00. However, by letter dated two days after trial, the Court notified the parties that upon further reflection it had determined that the $60,000.00 judgment should be increased to $74,514.50. In doing so, the Court noted that "reasonable attempts at repair, even if successful, would not be able to bring the value of the home up to what it would be without defects." The Court also noted, apparently in justification of $4,514.50 of the increase, that in its initial award of damages it "failed to include an amount to compensate Plaintiffs for payments in excess of the contract."

Mr. Brumitte contends that the Trial Court's award of damages should be reversed upon grounds that it is not supported by sufficient evidence in the record - specifically, that there is no proof in the record itemizing the costs of repairing defects complained of by the Eastbournes and that no proof was presented connecting any particular repair expense with any particular defect attributable to Mr. Brumitte, other than the expense of repairing the brick. Mr. Brumitte also notes that Mr. Eastbourne testified at trial that he was only asking the Court for an award of $76,000.00. Mr. Brumitte further asserts that the Trial Court's rationale for $10,000.00 of its *sua sponte* increase of damages from $60,000.00 to $74,514.50 is unclear. Finally, Mr. Brumitt asserts that the Eastbournes submitted no credible testimony regarding diminution in value.

Mr. Brumitte argues that if the Trial Court's award of damages is not reversed or vacated it should at least be reduced to the extent that it includes $7,833.00 representing costs of excess rental and storage because time was not of the essence in the contract between the parties in this case. Mr. Brumitte contends that the award of damages should also be reduced to the extent that it includes $4,204.00 representing fees and expenses of expert witnesses. Mr. Brumitte asserts that such expert witness fees and expenses are only allowable under a motion for discretionary costs pursuant to Tenn. R. of Civ. Pro. 56.04 and even then should be limited to fees/expenses incurred for actual deposition or trial testimony. Mr. Brumitte also argues that the Court ignored overage allowances due him in the amount of $10,717.66.

The Eastbournes argue that the Trial Court's award of damages was insufficient based upon un-refuted expert testimony that, in its final state of completion, the house was devalued between $196,469.00 and $245,500.00 as a result of Mr. Brumitte poor construction. In consequence, the Eastbournes contend that the award of damages should be increased to $200,000.00.

The record shows that, Mr. Eastbourne testified that he paid $86,819.00 to remedy defects in the house and complete its construction. However, in addition to this testimony, the Eastbournes

also introduced documentation showing a cost-by-trade breakdown of monies paid totaling $88,329.85 which they assert were paid to Mr. Alcorn for completion and repairs. The breakdown sheet shows that $12,037.12 of this amount represents excess storage and rental costs and fees charged by various experts to inspect and evaluate the house. These storage and rental fees and expert inspection and evaluation fees are those same fees to which Mr. Brumitte otherwise objects as noted above. Upon cross examination Mr. Eastwood concedes that he is not seeking reimbursement of this $12,037.12:

> Q And then on the next it says, "See next sheet." There's another $12,000 dollars in there.
>
> A Okay.
>
> Q And it looks like you've lumped in a whole bunch of stuff here. Excess rental, excess storage, Knox Hardwood Flooring Inspection. The items that are listed right here are included in this number that you're asking the Court to award you.
>
> A No. I'm asking the Court the $76,000.00 here.

The breakdown sheet shows that the $76,000.00 referred to by Mr. Eastbourne is actually $76,292.73. In view of Mr. Eastbourne's testimony, we find that the Trial Court's allowance of damages in the amount of $86,819.00 for repairs and completion was excessive by $10,526.27. Accordingly, it is our determination that the Trial Court's judgment should be reduced by $10,526.27.

Mr. Brumitte's argument that the judgment against him should be vacated in whole upon grounds that it is not supported by sufficient evidence is without merit. Mr. Eastbourne testified that the $76,292.73 shown on the breakdown sheet constitutes the amount of money he gave Mr. Alcorn for repair and completion of his house. And, although we have determined that the $86,819.00 allowed by the Trial Court for repair and completion was excessive based upon Mr. Eastbourne's testimony, we also note the testimony of Dr. Harold Deatherage, a professor of civil engineering. Dr. Deatherage testified that $86,819.00 was a "a very reasonable completion number considering the amount of remedial work that had to be done." This testimony of Dr. Deathererage necessarily supports a finding that the lesser amount of $76,292.73 was also reasonable.

Mr. Brumitte asserts that the Trial Court erred in failing to give him credit for monies he spent for certain items which cost more than the amounts allowed for those items under the contract. According to Mr. Brumitte, he is due a total of $10,717.66 for plumbing, electrical, painting, door locks and flooring overages. Our review of the record shows that on cross examination Mr. Brumitte admits that he's not sure if three electrical floor plugs, which he included as part of the overage amount at $300.00, were actually installed. It also appears that Mr. Brumitte included a $925.00 charge for door locks in the change orders for which he was given credit as part of the $28,561.50 noted above and appears to have also included this amount in the additional $10,717.66 he seeks in

overage. Accordingly, we find that evidence supports denial of Mr. Brumitte's claim for overages to the extent of $1,225.00. We do not; however, find evidence supporting the Trial Court's failure to award Mr. Brumitte the balance of the amount he claims for overage and, therefore, it is our conclusion that the judgment against him should be decreased by an additional $9,492.66 for that reason.

Finally, we address the Eastbournes' contention that $70,000.00 is inadequate to compensate them for diminution in the value of their house as a result of remaining defects. In support of this argument the Eastbournes reference the testimony of three witnesses - Mr. Eastbourne; Vickie Skofield and James Lee.

Mr. Eastbourne testified as follows regarding the value of the house:

Q. Mr. Eastbourne, assuming that you were a willing seller and you met up with a willing buyer, and you're not under any compulsion to buy – or to sell and so you're not under any compulsion to sell, given the current condition of your home, what do you think is a good and fair and reasonable price to be reached between you and a potential buyer?

A. I would say $550,000. What I meant $550,000, I meant that would be the asking price. Not what it would actually go for.

Ms. Skofield, a Loudon County real estate broker whose primary market is Tellico Village, testified that upon touring the Eastbournes' house she noticed separation and cracks in the hardwood floors, columns separating from the ceiling and sloping in the floor. She further testified that, without problems, she would price the house at $800,000.00:

Q Hypothetically, if you've got somebody just coming into your office wanting to look at a lake front $800,000 home, would you want you take them to the Eastbourne home?

A. No.

Q. Why?

A. Because in good conscience, I could not explain to them why I would think that their $800,000 home should have those problems. That is the price that I would put on that without problems.

Ms. Skofield also testified that she "would be very fortunate to get anywhere in the upper fives for Mr. and Mrs. Eastbourne's house. I think that it would probably be somewhere in the five hundred thousand dollar price range versus the eight hundred thousand dollar price range."

Mr. Lee, a real estate broker, appraiser, and licensed contractor, testified that the value of the house, not needing any repairs and without structural defects, would be $817,500.00. Mr. Lee further testified that, because of obvious visible problems in the house and without making any structural determination, the estimated fair market value of the house is $572,250.00.

Mr. Brumitte argues that the Eastbournes submitted no credible testimony regarding diminution. In support of this argument, he points out that, although Mr. Lee initially testified that he was currently licensed as an appraiser, upon cross examination he admitted that his license had been suspended. Mr. Brumitte asserts that it also developed upon cross examination that Mr. Lee's appraisal was "unsound and without merit."

The record shows that after testifying that he was a licensed appraiser, Mr. Lee was cross examined by Mr. Brumitte's attorney as follows:

> Q Mr. Lee I have a report printed this morning from Tennessee Real Estate Appraisers Commission that indicates that your real estate appraiser's license was suspended on March 8 of 2001. Do you deny that?

Mr. Lee subsequently testified that, although his license was in effect when he appraised the Eastbournes' house and prepared his appraisal report in December of 2000, his license was suspended as of March 8, 2001, for failure to meet continuing education requirements[1]. After hearing this testimony, the Trial Court stated that Mr. Lee's appraisal report and testimony "will come into evidence and I will give it such weight as I think it deserves."

The only other reference to the record made by Mr. Brumitte in support of his assertion that Mr. Lee's appraisal report was unsound and without merit is Mr. Lee's admission under cross examination that his appraisal report erroneously shows two bedrooms on the second level of the Eastbournes' home that are not there. However, we also the following additional testimony in that regard:

> Q And you don't even account for the bonus room but you account for two bedrooms that don't exist.
>
> A Well, sir, I'm accounting for five hundred and thirty-four square feet of finished area on Level 2.

---

[1] A letter in the record from the Tennessee Department of Commerce and Insurance Real Estate Appraiser Commission dated August 23, 2001, acknowledges that Mr. Lee has submitted everything that is necessary for renewal of his license, that his license will be made current after processing is complete and that this should occur in one to two days.

Q. But there's a big difference between a bedroom and a bonus room as far as evaluation. Isn't there?

A. No, sir. It's mostly considered heated finished square footage.

The only other evidence referenced by Mr. Brumitte in support of his assertion that the Eastbournes' presented no credible proof regarding diminution in value is the testimony of Michael Ben Cambell, a licensed and certified real estate appraiser. Mr. Campbell testified as follows regarding the limitations placed on the scope of his appraisal:

Q In all fairness, your appraisal was limited to seven particular areas that you were told to look at.

A Yes.

Q And your scope as an appraiser under Standard 5 was not to look or take into consideration any other issues other than look at these five thing, look at the transition of the floor and the brick veneer and the elevation of the front windows and the like, and that was all you were asked to look at?

A Yes.

Q And you were told that these issues and you bolded[2], I guess in your report, do not relate to any structural issues; is that correct?

A That's correct.

Q And in fact if assuming hypothetically that those issues did relate to structural issues, it would impact the home?

A It would impact the market value.

The seven areas Mr. Campbell testifies he was requested to examine were the brick paver sidewalk and patio, the elevation of the front windows, the brick veneer on the outside of the house, cracks in the concrete of the garage floor, the bonus room/stair tread flooring transition, the hardwood maple flooring and the slope in the utility room floor. Mr. Campbell's testimony and report show his findings and conclusions regarding each of these areas as follows:

---

[2] Our review of Mr. Campbell's report shows that use of the word "bolded" apparently refers to the capitalization of letters in the following sentence from that report: " It is my understanding that all issues DO NOT relate to any structural issues."

1. Brick paver sidewalk and patio - Mr. Campbell noted in his testimony that joint lines in the patio were not straight. His report noted, however, that the joint lines were acceptable and he concluded that this would have no negative impact on market value.

2. Elevation of front windows - Mr. Campbell testified that it was pointed out to him that the garage windows and the front windows were not at the same elevation, but concluded this would have not have a negative impact on market value.

3. Brick veneer - Mr. Campbell notes in his report that "the issue of the brick work spacing (oversize and undersized mortar joints) does not impact the market value of the home."

4. Cracks in garage floor concrete - Addressing this issue as aesthetic and not structural, Mr. Campbell asserts in his report "It has been my experience that concrete floors often have surface cracks which does not impact market value."

5. Bonus room/stair tread flooring transition - Mr. Campbell's report notes a difference in elevation between the stair tread and bonus room flooring but indicates in his report that had the bonus room been covered with carpet flooring and pad this difference would have been eliminated Mr. Campbell concludes that "the elevation difference is not a tripping hazard nor a negative impact on market value."

6. Hardwood maple flooring - Mr. Cambell notes a gap in the hardwood flooring between the kitchen and the den but concludes that it would not negatively impact market value.

7. Slope in floor of utility room - Mr. Campbell states in his report that in his opinion a better description of this problem "would be a low spot area (Valley) compared to a sloping floor." Mr. Campbell notes his understanding that this problem is not structural and concludes that it has no impact on market value. However, Mr. Campbell also states that "[i]f the floor issue was structural, then this would impact market value."

In view of the limited scope of Mr. Campbell's examination and his admission that his conclusions are based on an assumption that none of the problems he examined are caused by structural defects, we do not find that his testimony and report are sufficient to negate other evidence presented in this case that the Eastbournes' house suffered diminution in value. At one point in his testimony, Mr. Campbell admits that Ms. Scofield, who testified that the house did suffer diminution in value, is a reliable or good source of information and that she is very knowledgeable of the Tellico Village market. Additionally, although Mr. Campbell's appraisal is premised on the theory that there are not structural problems in the house, the Trial Court determined that there are structural problems based upon its own inspection of the house and evidence presented at trial. In this regard the Court stated as follows:

> All you got to do is walk across the floor and you could feel the difference in the elevation of the level of the floor. And it's noticeable when you walk

across it. And not only that, but there were places where the sloping that at times to me it seemed as if the floor was not substantial. And that is, it didn't feel like a solid floor, for some reason, it didn't.

And so I think this is a real problem. I think the floors – if I had to pick out one thing that would trouble the plaintiffs with regard to the construction of this home, it would be the fact that the wall which supports the floor trusses out there on which they rest, come together, was obviously built substantially lower than the supporting walls at either end. It was built wrong.

There again failure to see the defects. And the experts who testified all said that it would be a problem to come in and raise, jack up the trusses because of the racking effect that that could have on the house and the sheetrock and the nails and other things of that sort. And I accept that.

The Trial Court further found that the crack in the hardwood floor was related to the trusses, and that the cracks in the garage floor were worse than would be normal. With respect to defects not included in Mr. Campbell's appraisal, the Court found that columns on the outside porch don't line up because the heads of the columns are too big. "And what could be done to repair those now and to make it fit better, I don't know. But it still, it does – if you stand there and look at it , it's a problem."

Neither the Trial Court nor this Court is bound by the testimony of the Eastbournes' witnesses even to the extent that that testimony is not contradicted. *Ford Motor Co. v. Taylor*, 446 S.W.2d 521 (Tenn. Ct. App. 1969). Our review of the record in this case does not convince us that the Eastbournes should receive increased damages in the requested amount of $200,000.00. However, based upon the findings of the Trial Court and the record as a whole, it is our determination that the Eastbournes should receive some additional damages in order that they may be adequately compensated for diminution in the value of their house and for that reason we increase the award for diminution in value by $20,000.00.

In sum, the original award of damages is decreased by the amount of $20,018.93 and increased by the amount of $20,000.00 . Accordingly, the original ward of damages in the amount of $74,514.50 is hereby changed to $74,495.57.

For the foregoing reasons the judgment of the Trial Court is affirmed as modified and the cause remanded for enforcement of the judgment and collection of costs below. Costs of appeal are adjudged against Roger Brumitte, d/b/a Roger Brumitte Construction and his surety.

_____

HOUSTON M. GODDARD, PRESIDING JUDGE