IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 9, 2007 Session

BOGGS KURLANDER STEELE, LLC V. HORIZON
COMMUNICATIONS, INC.

Appeal from the Chancery Court of Davidson County
No. 04-3122-III     Ellen Hobbs Lyle, Judge

———————————————

No. M2006-00018-COA-R3-CV - Filed February 21, 2008

———————————————

This appeal involves a declaratory judgment regarding the termination of a contract to install a cable system and provide cable service to a trailer park as well as a counter-complaint for damages.  The trial court determined that the contract was properly terminated and dismissed the counter-complaint. On appeal, the Appellant argues that (1) the Appellee waived its contractual right to have this matter decided pursuant to Kentucky law; (2) that the trial court erred in determining that  it materially breached the contract by failing to install a new system in a timely manner; (3) that the trial court erred in determining that it did not provide cable service equal to the service rendered by the former cable provider; (4) that the trial court erred in determining that the contract was properly terminated; (5) that it is entitled to damages because the Appellee failed to notify the Appellant with information about new residents as required by the contract; and (6) that the trial court erred by awarding the Appellee its attorney's fees and failing to award the Appellant its attorney's fees.  We find that the Appellee has waived its right to have this matter determined pursuant to Kentucky law.  The trial court did not err in determining that the Appellant materially breached the contract by not providing cable service equal to the service previously provided and that the contract was properly terminated.  Furthermore, we find  that the Appellant is not entitled to damages because the Appellant did not prove what damages it incurred due to the Appellee's failure to provide the homes of new residents as required by the contract.  Finally, the trial court did not err in awarding the Appellee's attorney's fees.  The judgment of the trial court is affirmed, and this cause is remanded to the trial court for the award of Appellee's attorney's fees on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded.**

JERRY SCOTT, SR. J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

Kirk L. Clements, Goodlettsville, Tennessee, for the appellant, Horizon Communications, Inc.

1

Culwell E. Ward, Nashville, Tennessee, for the appellee, Boggs Kurlander Steele, LLC d/b/a Old Hickory Mobile Estates.

## OPINION

## FACTS

The Appellee, Boggs Kurlander Steele, LLC (B.K.S.), owns and operates a mobile home park in Davidson County under the name Old Hickory Mobile Estates (the Park). The residents own their mobile homes and lease their lots from B.K.S. On June 25, 2003, B.K.S. entered into a contract with the Appellant, Horizon Communications, Inc. (Horizon), giving Horizon the exclusive right to provide cable television service to the residents of the Park who subscribed to its service. Previously, the Park's cable service was provided by Eddie Clinnard. Mr. Clinnard owned and operated the system until his death, which occurred six months prior to the signing of the contract. The system provided by Mr. Clinnard was old and used inadequate parts. Specifically, the system was analog rather than digital, used the wrong size cables and used splitters instead of tapouts. After Mr. Clinnard's death, his estate continued to operate the system until it sold the system to Horizon.

Prior to signing the contract, Horizon sent a solicitation letter to B.K.S. on June 10, 2003, which stated in pertinent part:

> Should you select Horizon as your provider, we have determined that it will be necessary to replace the receiving equipment as well as the cable and distribution plant electronics. The replacement of the receiving equipment would take place immediately since we would want to replace most of the old large C brand dishes with one small 30 inch Digital dish. While the new distribution plant is being constructed, we will be forced to use the existing plant to ensure a seem less (sic) transition.

Three days later, Horizon sent another letter to B.K.S., which stated in pertinent part, "This proposal is based on using the existing underground cable and amplifiers as they now exit (sic). Horizon will not rebuild the system at this time." On June 25, 2003, the parties signed a seven year "Private Cable Installation Service and Programming Agreement" (the Contract).[1]

The eight page Contract states, in pertinent part:

---

[1] The Contract, shows by its terms that it was prepared as a standard, "one size fits all" contract for the provision of cable television "for the use and enjoyment of the Owner's apartment occupants . . . their guests and invitees." Nothing in the contract refers to the acquisition of an existing cable television system in a trailer park. Many parts of the contract are irrelevant as they relate to installation in "common hallways, stairways and other areas of common public access."

"The operator shall, at its own expense, install the System on the Property."

"The operator shall, at its own expense, operate and maintain the system and keep it in good repair."

Thereafter, Horizon bought the existing cable television equipment from Mr. Clinnard's estate for $5,000.00 without inspecting or even seeing it and provided service to the residents using the system Mr. Clinnard had installed. The contract contained no deadlines for Horizon to install the "System on the Property." Paragraph 13 of the contract provided that Horizon "shall include the program services comparable to thse provided by the local cable companies or reasonable substitutes therefor." The court found that "[a]lmost immediately upon signing the contract Horizon replaced the head end of the system which was primarily the receiving equipment. Time consuming and labor intensive the replacement of the old deficient cable proceeded at a slower pace."

On June 23, 2004, Kitty Alyae, the park manger and agent of B.K.S., allegedly signed a contract with Comcast to provide the Park with cable television service. On July 30, 2004, when only 30% of the old cable from Mr. Clinnard's system had been replaced, Ms. Alyae sent the following letter to Horizon:

> Old Hickory Estates is hereby giving you your 30 day notice to stop cable service as we are unhappy with the current service you have provided us in the past year. When you started with us you informed me that you would bury the cable as you went so we would no longer have people cutting the lines everyday. (sic) When I have talked to you about this all you can say to me is that it will be done as soon as possible and that is still your answer whenever I have talked to you on the phone. I am unhappy with the way you are running the system and the continuing outages of the channels. Every time the weather moves in we loose (sic) half the channels and have to have them reset constantly. It has been over a year since we signed the contract and you have still not finished laying the cable for the park. We are no longer willing to wait till some future date for you to do so. We would rather be without cable then to continue with your service. The contract states that if we are unhappy with the service we can cancel our contract with you and I am doing so now. I have asked several times over the last several months when you are going to finish setting up and burying the lines and you keep putting me off. The owner and I no longer whish to continue working with you on this. Consider this your notice to remove the cable equipment from the Old Hickory Estates office and the cable from in front of the boat yard.

Horizon did not respond to her letter. On September 15, 2004, counsel for B.K.S. wrote a letter to Horizon, as follows:

3

I represent Old Hickory Mobile Estates with whom Horizon Communications, Inc. contracted on June 25, 2003. The contract is entitled "Private Cable System Installation and Programming Agreement."

Under the terms of the agreement, Horizon is required under (sic) its own expense to operate and maintain the system and keep it in good repair. On many occasions, the system has failed and your company has failed to make timely repairs. The continued failure on the part of Horizon constitute a material breach in (sic) the contract. Therefore, let this letter serve as formal notice to you of cancellation of the contract due to the material breaches by Horizon Communications, Inc.

You are requested, in accordance with paragraph number 18 of the contract to remove your equipment associated with the operation of the system at your expense and remove the system and restore the premises to the condition it was in prior to the installation of the system.

Please contact Kitty Alyae with Old Hickory Mobile Estates in order or coordinate the removal of the equipment.

On November 2, 2004, B.K.S. filed a complaint seeking a declaratory judgment that its termination of the contract with Horizon was valid and that B.K.S. has no remaining obligations or liabilities to Horizon under the contract. B.K.S. also sought recovery of its attorneys' fees and "any and all other damages proven as a result of the breach." On January 26, 2005, Horizon filed its Answer and Counter-Complaint seeking a declaratory judgment that B.K.S. breached the contract and asking for compensatory and punitive damages. The parties entered into an agreement under which Horizon would continue to provide cable television service during the pendency of the lawsuit without triggering a waiver of B.K.S.'s claims.

The trial court concluded that Horizon "materially breached the contract by not providing a functioning cable system within a reasonable time (six months) of signing the contract and thereafter." The court also concluded that the "parties did intend in their contract for there to be installation of a new system," including new cable. The trial court further concluded that "the failure of [Horizon] to provide a cable system on par with the Clinnard system six months into the contract and thereafter and the failure of [Horizon] to bury newly installed cable are essential elements of the contract and go to the heart of the Contract." The court further concluded that Horizon materially breached the Contract and that Horizon's "defense and counterclaim that [B.K.S.] breached the contract are dismissed because [B.K.S.'s] breaches either were not material or occurred after the defendant breached." The Court declared that B.K.S. had "no obligations or liabilities under the contract" and Horizon's counterclaim was dismissed. The attorney for B.K.S. was awarded attorney's fees in the amount of $12,250.00.

4

## ISSUES

Horizon presented the following issues on appeal:

I.    Whether B.K.S. waived its contractual right to have this matter decided pursuant to Kentucky law.

II.   Whether the trial court erred in finding that Horizon failed to provide cable service equal to Mr. Clinnard's service.

III.  Whether the trial court erred by holding that B.K.S. properly terminated the contract.

IV.   Whether the trial court erred by finding that Horizon was not entitled to damages because B.K.S. failed to notify Horizon with information about new residents as required by the contract.

V.    Whether the trial court erred in finding that Horizon materially breached the Contract by failing to install a new system in a timely manner.

VI.   Whether the trial court erred by awarding B.K.S. its attorney's fees and failing to award Horizon its attorney's fees.


## STANDARD OF REVIEW

The standard of review of a trial court's findings of fact is de novo, and we presume that the findings of fact are correct unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); Rawlings v. John Hancock Mut. Life Ins. Co., 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. Walker v. Sidney Gilreath & Assocs., 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); Realty Shop, Inc. v. R.R. Westminster Holding, Inc., 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). Where the trial court does not make findings of fact, there is no presumption of correctness and we "must conduct our own independent review of the record to determine where the preponderance of the evidence lies." Brooks v. Brooks, 992 S.W.2d 403, 405 (Tenn. 1999). Appellate courts must also give great weight to a trial court's determinations of credibility of witnesses. Estate of Walton v. Young, 950 S.W.2d 956, 959 (Tenn. 1997); B & G Constr., Inc. v. Polk, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). Issues of law are reviewed de novo with no presumption of correctness. Nelson v. Wal-Mart Stores, Inc., 8 S.W.3d 625, 628 (Tenn. 1999).

## ANALYSIS

**I.**     **The first issue is whether B.K.S. waived its right to have this matter decided pursuant to Kentucky law.**

The Contract contains a clause which provides that it "shall in all respects be governed by and construed in accordance with the laws of the State of Kentucky." Horizon claims that B.K.S. waived its right to have this case decided pursuant to Kentucky law. B.K.S. claims that Kentucky law is the same as Tennessee law and "there was no waiver of the use of Kentucky law because everything which [Horizon] claims [B.K.S.] did as a waiver if done, was done after suit was filed and had no impact upon [Horizon's] performance under the contract."

Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure provides that an appellant's brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, <u>with citations to the authorities</u> and appropriate references to the record (which may be quoted verbatim) <u>relied on</u>." (Emphasis added). "The Appellant's Brief 'should contain an argument setting forth the contentions of the appellant with respect to the issues presented with citations to the authorities and appropriate references to the record'" <u>Newcomb v. Kohler Co.</u>, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006) (quoting <u>Rhea County v. Town of Graysville</u>, No. E2001-02313-COA-R3-CV, 2002 WL 1723681, at *7 (Tenn.Ct.App. July 25, 2002). "The failure of a party to cite to any authority or to construct an argument regarding his position on appeal constitutes waiver of that issue." <u>Id.</u> at 402; <u>see also</u> <u>Rector v. Halliburton</u>, No. M1999-02802-COA-R3-CV, 2003 WL 535924, at *9 (Tenn.Ct.App. Feb.26, 2003) (per curiam); <u>Rhea County</u>, No. E2001-02313-COA-R3-CV, 2002 WL 1723681, at *7 (Tenn.Ct.App. July 25, 2002).

On appeal, B.K.S. only cited one Kentucky case in its brief, claiming that the cited Kentucky case supports its position that Kentucky contract law is the same as Tennessee contract law and that it has not waived its right to have this case decided under Kentucky law.[2] However, in support of all of its other arguments, B.K.S. cited 22 Tennessee cases. Under on Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure and the cases cited above, we find that B.K.S. waived its right to have this case decided under Kentucky law. Accordingly, we have determined the appellate issues pursuant to Tennessee law.

**II.**     **Whether the trial court erred in finding that Horizon materially breached the contract by failing to provide cable service equal to Mr. Clinnard's service.**

---

[2] The cited case, <u>West Kentucky Coal Co. v. Nouvse</u>, 320 S.W.2d 311, 314-15 (Ky. Ct. App. 1959), was cited only for the proposition that "a party who commits the first breach of a contract is deprived of the right to complain of a subsequent breach by the other party."

The trial court found that Horizon was required by the Contract to provide cable service "as well as or better than" Mr. Clinnard's system. In construing contracts, our Supreme Court stated, "If a contract is plain and unambiguous, the meaning thereof is a question of law, and it is the Court's function to interpret the contract as written according to its plain terms." Bratton v. Bratton, 136 S.W.3d 595, 601 (Tenn. 2004).

In this case, the Contract provides that "[t]he operator shall, at its own expense, install the System on the Property." "Systems" (sic) is defined as "broad band telecommunications equipment, earth stations, installation equipment, amplifiers, cable receivers, converters and any and all related equipment for a private cable system . . . ." The Contract further provides that "the Operator can provide exclusive programming and maintenance services for the System on the Property" and "the Owner wishes to secure said services . . . and the Operator desires to install the System and provide the Service . . . ." The Contract contains no language addressing the level and quality of service that the system must provide. Thus, the Contract is ambiguous and parole evidence was required to determine what the parties agreed upon.

Ms. Alyae testified that she expected the system to be "[a]t least the same or better" as the previous system owned and operated by Mr. Clinnard. In describing Mr. Clinnard's system, Larry Edward Lewis, of Bardstown, Kentucky, a small interest owner of Horizon, stated in his deposition that "[i]t was pretty bad, you know, for a cable system to be operating. I don't see how they stayed and kept their contact (sic) with the guy that owned it before and let it go as long as they did like it was." He further stated that the system used the wrong size cables and used splitters instead of industry standard taps. Mr. Lewis' testimony was that they decided they were "gonna have to go through and rebuild everything," indicating that he expected Horizon's system to be better than Mr. Clinnard's system. Gunther Diefes, of Doylestown, Pennsylvania, the majority owner of Horizon testified that his company installed higher grade amplifers, replaced defective amplifers, began replacing old cable with more appropriate cable and "it was made very clear that the old system would stay in place to ensure a smooth transition for when we did rebuild the system." He further testified that to improve the signal quality, they decided to go to a digital system immediately and did so. Therefore, based on Ms. Alyae, Mr. Lewis, and Mr. Diefes' testimony, we find that the parties reasonably expected Horizon's system to be the same as or better than Mr. Clinnard's system. Thus, Horizon was required by the Contract to provide cable service equal to or better than Mr. Clinnard's system.

The trial court found that the parties agreed that Horizon needed time to transition from Mr. Clinnard's system to Horizon's system and the Court decided that six months was a reasonable time for the transition to take place. The trial court further concluded that the service provided by Horizon was routinely and significantly inferior to that provided by Mr. Clinnard after the six month transition period. On appeal, the trial court's decision that six months was a reasonable time for the transition period was not questioned by either party. As a result, any issues regarding the trial court's finding that six months was a reasonable transition period are waived. Newcomb, 222 S.W.3d at 401. However, Horizon claims that the trial court erred by finding that the service it provided was routinely and significantly inferior to that provided by Mr. Clinnard. The court based its finding on the testimony of the property manager, Ms. Alyae,

an assistant manager, Sheila McElvain and residents Barbara Rigsby, Sara Finley, Amy Ritchie and Ricky Myers.

Ms. Alyae testified that when outages occurred after Ricky Myers left Horizon's employment, its personnel did not respond until the weekend regardless of what day of the week the service was interrupted. She further testified that she had a "hard time seeing" the lower channels on Horizon's system, but that under the former system, Mr. Clinnard was "always adjusting so that we could at least see them and hear them." Ms. Alyae also stated that the higher channels would freeze under Horizon's system, but not under Mr. Clinnard's system.

Ms. McElvain testified, "Well, [Mr. Clinnard's] system, we didn't lose channels to where the [Horizon] system we'd lose channels. We've had them out for two or three days at a time, the channels." She further testified that under Mr. Clinnard's system, the pictures did not roll, but that under Horizon's system, the pictures rolled.

Ms. Rigsby testified that under Mr. Clinnard's system there were problems, but normally they were fixed the same day. However, she testified that when problems arose under Horizon's system, that Horizon's representative may come that day or wait until next week to come fix the problems. She also testified that she could not receive Channel 5 at all for a whole month.

In comparing Mr. Clinnard's service to Horizon's, Ms. Finley testified that "on a scale of 1 to 10, [Mr. Clinnard's service] probably was about a 9 or 10" and Horizon's service "is generally over the entire course that I've had 'em maybe a 6 or 7." She further testified that until approximately a month prior to the trial proceedings on August 29, 2005, Horizon's service was "pretty bad," but within the three weeks before the trial "[i]t just started working."

Ms. Richie testified that under Mr. Clinnard's system, "the quality was really good with him." As to Horizon's system, Ms. Richie testified that

> The - - well, when it first started out, we knew there was going to be problems because they told us there would be through the transfer. But the problems didn't even end after they got the transfer. It continued on for the past two years - - there for the past – there was like two months we didn't have Channel 5 at all. Channel 11, you really couldn't watch, 10 was fuzzy or you couldn't hear it. Two and four I don't watch a whole lot, but even when I did, it wasn't clear pictures.

Ms. Richie further stated that the "problems continued up until maybe a week ago."[3] She also testified that she called Horizon twice about her problems and was told somebody would come out to fix her reception. Nobody ever went to her home either time.

---

[3] She testified on August 29, 2005.

Mr. Myers, who formerly worked for Mr. Clinnard and Horizon as an installer and repairer, testified that the quality of the picture under Horizon's system was "very good" sometimes, but that "several times it was very, very poor." Mr. Myers also testified that the reputation of Horizon as to the quality of picture provided was very poor. He also testified that Horizon took out the older analog equipment and replaced it with brand new digital equipment.

Horizon presented three witnesses who were residents of the park and Horizon's customers. They all testified that its service was good. Elma Jean Dunn and Gladys Pool saw no difference between the old and the new systems, although, Ms. Pool had complained about the inability to receive Channel 5 for a couple of months. Michelle Delilla, testified that she was satisfied with Horizon's service even though for about four or five weeks the cable "would go out like every Friday or Saturday" and service personnel would come and fix the problems. Another resident of the Park, Freddie Gutierez, who was employed part time by Horizon, had Mr. Clinnard's service for three or four months, after which he got a satellite dish. He was employed to lay the cable on Saturdays and Sundays when he was off from work at his other employer's business. After he buried cable, it was maybe a month or more before the new cable was actually hooked up. However, the trial court specifically found those witnesses were not credible.

Mr. Lewis testified that he works twelve hours a day for two other cable companies and worked for Horizon at the Georgetown, Kentucky, and Madison, Tennessee, locations. He installed the receiving equipment soon after the contract was signed. When he had work to do for Horizon, he got to it when he could. He hired two men to work part time on Horizon's system in the Park. Almost half of the cable was lying on top of the ground and he had trouble getting workers to dig the trenches to properly lay the correct size cable. Most of the work was done of the weekends. We review a trial court's determinations on matters of witness credibility with great deference and will not re-evaluate a trial judge's credibility determinations unless they are contradicted by clear and convincing evidence. Wells v. Tenn. Bd. of Regents, 9 S.W.3d 779, 783 (Tenn. 1999). As so often occurs, B.K.S.'s witnesses' testimony was contrary to Horizon's witnesses, and the evidence does not contradict the trial court's findings regarding witness credibility. Therefore, we cannot re-evaluate the trial judge's credibility determinations.

Since the trial court found, without objection by either party, that six months was a reasonable time for the transition to take place, Horizon had six months from the date of the Contract to provide cable service equal to or better than Mr. Clinnard's system, and Horizon breached the contract by not providing cable service that met that requirement. The court found that Horizon replaced the old receiving equipment with new equipment almost immediately after the contract was signed but the "time consuming and labor intensive work to replace the old deficient cable proceeded at a slower pace." Based on the quoted testimony and the entire record, we find that the preponderance of the evidence supports the trial court's finding that Horizon did not provide cable service equal to or better than Mr. Clinnard's system within the six month transition period. Thus, Horizon breached the Contract on December 26, 2003, six

months after the date of the contract, and the breach was clearly material because cable television service was what the Contract was all about.

**III.    Whether the trial court erred by holding that B.K.S. properly terminated the contract.**

Paragraph 19(a) of the contract states in pertinent part:

Either party, in addition to whatever other remedies it may have at law or otherwise, may elect to terminate this Agreement and be relieved of any liabilities and obligations hereunder in the even of any "default" on the part of the other party.  Either party shall be deemed in default hereunder if:

> (1) it breaches or defaults in the performance of any material provisions hereof on its part to be performed, and fails to remedy or make good faith attempt to remedy the same within a period of forty-five(45) days after the receipt of written notice from the other party specifying such breach or default . . . .

In the letter dated July 30, 2004 and quoted in the Facts section, Ms. Alyea gave Horizon notice specifying the breaches.

Paragraph 19(a) of the contract only requires a letter from the opposing party specifying the breach in order to give the breaching party forty-five (45) days to cure.  The quoted letter specifically described the breaches.  Therefore, Horizon had 45 days (not 30 days as stated by Ms. Alyae) from July 30, 2004 to cure the breaches specified in the letter, particularly the "continuing outages of the channels."  The record contains no evidence that any of the breaches were cured within the 45 day period.   As a result, B.K.S. had the right to terminate the contract on September 13, 2004.  By letter dated September 15, 2004, the attorney for B.K.S. properly terminated the contract.

**IV.    Whether the trial court erred by finding that Horizon was not entitled to damages because B.K.S. failed to notify Horizon with information about new residents as required by the contract.**

To assess damages when two parties breach the same contract, courts must determine whether the breaches are material and when the breaches occurred.  Generally, "[a] party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract," but is entitled to damages resulting from any breach occurring prior to the material breach. McClain v. Kimbrough Const. Co., 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990).

10

The trial court found that Horizon materially breached the Contract by not providing cable service equal to or better than Mr. Clinnard's service within six months after the contract was signed. Hence, Horizon's material breach occurred on December 26, 2003, six months after the contract was signed.

The trial court also found that B.K.S. breached the Contract by not notifying Horizon about new residents moving into the Park. The trial court further found that the breach was not material because Horizon had not complained about the lack of notification until August 2003 after the first termination letter regarding was sent by B.K.S. and that other effective means of reaching the new resident market were being used. Specifically, B.K.S. provided new residents with an orientation packet that contained information about the various channels available, the monthly charges for cable service and Horizon's name and WATS line number to call for service. On appeal, Horizon claims that the trial court erred by concluding that B.K.S.'s breach was not material.

To determine whether B.K.S.'s breach was material, we apply the factors set out in McClain v. Kimbrougn Const. Co., 806 S.W.2d 194 (Tenn. Ct. App. 1990). Those factors are:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Id. at 198 quoting Restatement (Second) of Contracts § 241 (1979). Applying these factors, we agree that B.K.S.'s breach was not material. First, Horizon was not greatly deprived of a benefit. Specifically, Horizon's actions prove that it was not deprived of a benefit it reasonably expected because Horizon never complained to B.K.S. about not being notified until after the first termination letter was received. Horizon admitted that its marketing tactics were not aggressive enough. Second, Horizon could be adequately compensated. Third, B.K.S. will not suffer forfeiture due to that breach. B.K.S. cannot cure the breach by providing the names after the contract has been terminated. Finally, B.K.S.'s failure to perform, although surely a breach, comported with the standards of good faith and fair dealing. The relationship between the parties was amicable and Ms. Alyea surely would have provided the listings of new residents had Horizon's representatives raised the issue with her. Therefore, we affirm the trial court's determination that B.K.S.'s breach was not material.

After determining that B.K.S.'s breach was not material, the trial court dismissed

Horizon's counter complaint awarding no damages. The trial court did not state any factual reasons for not awarding damages. Therefore, review of that aspect of the issue is de novo with no presumption of correctness.

Because Horizon was seeking the damages, Horizon had the burden of proving its damages. BancorpSouth Bank, Inc. v. Hatchel, 223 S.W.3d 223, 230 (Tenn. Ct. App. 2006) citing Overstreet v. Shoney's, Inc., 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999). "Damages may never be based on speculation or conjecture." Waggoner Motors, Inc. v. Waverly Church of Christ, 159 S.W.3d 42, 57 (Tenn. Ct. App. 2004) citing Overstreet, 4 S.W.3d at 703; Western Sizzlin, Inc. v. Harris, 741 S.W.2d 334, 335-36 (Tenn. Ct. App. 1987). "However, damages become too speculative only when the existence of damages is uncertain, not when the precise amount is uncertain." Id. citing Church v. Perales, 39 S.W.3d 149, 172 (Tenn. Ct. App.2000). "The evidence required to support a claim for damages need only prove the amount of damages with reasonable certainty." Id. citing Wright Med. Tech., Inc. v. Grisoni, 135 S.W.3d 561, 595 (Tenn. Ct. App.2001); Overstreet, 4 S.W.3d at 703. "While the amount of damages to be awarded in a given case is not controlled by fixed rules of law or mathematical formulas, the evidence upon which a party relies to prove damages must be sufficiently certain to enable the trier of fact, using its discretion, to make a fair and reasonable assessment of damages." BancorpSouth, 223 S.W.3d at 230 citing Overstreet, 4 S.W.3d at 703, Wilson v. Farmers Chem. Ass'n, Inc., 444 S.W.2d 185, 189 (Tenn. Ct. App. 1969).

As previously stated, the Court found that Horizon's material breach of the Contract occurred on December 26, 2003. Generally, "[a] party who materially breaches first is not entitled to damages stemming from the other party's later breach of the same contract." McClain, 806 S.W.2d at 199. Therefore, Horizon is not entitled to damages resulting from B.K.S.'s failure to report any new residents moving in or signing a lease after December 26, 2003.

As to the damages resulting from B.K.S.'s failure to report new residents moving in or signing a lease prior to December 26, 2003, Mr. Defies, the primary owner of the company, testified, "We find that when we get first shot, that is to say, between the dish, Direct TV satellite receiver and us, that in most of our other systems we get 70 percent of those subscribers." He further testified that normally Horizon's customer base grows "anywhere from 5 to 10 percent per month" reaching a total of around 70 percent. Based on Mr. Defies's testimony and Ms. Aleya's testimony that 140 new residents moved in between July of 2003 and July of 2004, Horizon argues that if it was able to sign up 33 percent instead of 70 percent of the new residents its customer base should have grown by two subscribers per month and that for each subscriber Horizon would make a profit of $17.00 per month.[4] There was no proof as to the number of new subscribers Horizon actually obtained prior to December 26, 2003. Horizon

---

[4] That amount does not take into account that Horizon was required to pay B.K.S. $2.00 per month for each subscriber, which would effectively reduce Horizon's profits to $15.00 per subscriber per month.

obviously had business records that could have revealed the number of new subscribers it had acquired vis-a-vis the number of new residents moving into the park. However, no records concerning that issue were introduced. Moreover, Horizon concedes that "a portion of the lack of growth can be contributed to a less than aggressive marketing plan" and the initial difficulties it experienced to install the system, which resulted in poor service. Therefore, we find that Horizon failed to prove its damages to a reasonable certainty because it presented only speculative evidence that its customer base should have increased by two subscribers per month and that some if not all of its damages could be attributed to Horizon's own shortcomings. Hence, we affirm the trial court's decision to dismiss the counter complaint and award no damages.

**V.      Whether the trial court erred in finding that Horizon materially breached the Contract by failing to install a new system in a timely manner.**

Having determined that the Contract was properly terminated and that Horizon is not entitled to damages, we do not need to further examine the issue whether the trial court erred in finding that Horizon materially breached the Contract by failing to install a new system in a timely manner.

**VI.     Whether the trial court erred by awarding B.K.S. its attorney's fees and failing to award Horizon its attorney's fees.**

Neither party cited any legal authorities for their positions regarding attorney's fees. Hence, the issue was waived. Tenn. R. App. P. 27(a)(7). Attorney's fees are ordinarily awarded only to the prevailing party. Tenn. R. Civ. P. 54.04(2). As the losing party, Horizon would not ordinarily be entitled to attorney's fees. Horizon has not argued or explained why it should be paid its attorney's fees by the prevailing party. B.K.S. agrees that attorney's fees should be awarded to the prevailing party and seeks remand to the trial court for calculation and award of additional attorney's fees through the appellate process.

The judgment of the trial court is affirmed. This cause is remanded to the trial court for the award of B.K.S.'s appellate attorney's fees in accordance with the terms of the contract, if any are found by the trial court to be appropriate.

_____
Jerry Scott, Senior Judge

13